638 So.2d 481 (1994)
Raymond Steven SELLERS
v.
Carolyn Ann Harvey SELLERS.
No. 92-CA-0693.
Supreme Court of Mississippi.
June 9, 1994.
Albert B. Smith, III, Cleveland, for appellant.
A.E. (Rusty) Harlow, Jr., Harlow & Harlow, Grenada, for appellee.
Before DAN M. LEE, P.J., and PITTMAN and JAMES L. ROBERTS, Jr., JJ.
JAMES L. ROBERTS, Jr., Justice, for the Court:

I.

INTRODUCTION
On July 3, 1992, the Chancery Court of Bolivar County granted the appellant, Raymond Steven Sellers ("Mr. Sellers"), a divorce from his wife, the appellee, Carolyn Ann Harvey Sellers ("Mrs. Sellers"), on the *482 ground of adultery. The chancellor denied Mrs. Seller's prayer for a divorce on the ground of habitual cruel and inhuman treatment and also denied her request for alimony. In addition, the chancellor stated that neither parent was fit at that time to have custody of Anna, the one child born of this marriage, and awarded custody of Anna to Barbara Outz ("Mrs. Outz"), the child's maternal aunt. From this ruling, Mr. Sellers appeals, citing the following error:
I. Whether the law stating that the interest of a child will be best served by remaining in the custody of his natural parents, is superior to the presumption that siblings should not be required to live apart.
We hold that the chancellor erred in awarding custody of the child to her maternal aunt, as there was no finding that Mr. Sellers was clearly unfit. We reverse and remand for findings on Mr. Sellers' current fitness as a parent.

II.

FACTS
Raymond and Carolyn Sellers were married on May 16, 1988. The couple had one child, Anna Sellers, born November 17, 1987. Mrs. Sellers had been married twice previously, in 1981 and 1986, and had one child by the first marriage, Jeremy Edmonds. The couple separated on June 7, 1991, when Mrs. Sellers moved out of the marital home with the children. Mrs. Sellers left the following note:
Raymond I'm gone for good. don't come looking for me. I've got the kids with me. I got your check so I could have some money to feed the [sic] until I go to work. I told you three month ago I wanted out. So I'm gone. I be in touch soon here is my ring I'll be good to them. and you'll see them also. I just don't love you anymore.
 see ya
 6-7-91 6:48 P.M Carolyn & Kid
After leaving Mr. Sellers, Mrs. Sellers moved to Grenada and moved into the residence of Tonya and Frank Ratliff, where Jimmy Phillips had been residing for quite some time. Although she claims she began dating Jimmy Phillips after her separation from Mr. Sellers, Bonnie Shields, a next door neighbor of Tonya and Frank Ratliff, testified that Mrs. Sellers and Jimmy Phillips moved in together the first or second week of June, 1991, approximately the same time she left Mr. Sellers. Mrs. Sellers lived with Jimmy Phillips at the Ratliff residence for approximately six months before an incident of abuse of Jeremy that led to the removal of the minor children from Mrs. Sellers's custody.
The incident of abuse occurred in the summer of 1991. Jimmy Phillips beat Jeremy with the wire end of a flyswatter on the front porch of the house at approximately 1:00 a.m. Phillips then left the child on the front porch until approximately 3:00 a.m., periodically coming outside to verbally abuse him. During this time, Jeremy was clad only in a pair of little girl's panties. Jeremy was forced to remain in the panties the next day while standing in a corner. Jimmy Phillips called over Jeremy's friends, his own friends, relatives, and neighbors to view Jeremy. This treatment continued until that night when Tonya Ratliff finally put an end to the abuse. This abuse was witnessed by an abundance of witnesses, including Mrs. Sellers, who testified that she approved of the punishment by stating, "It wasn't any worse than anything Raymond ever did." Jeremy was punished for stating he used a bathcloth when he took a bath when in fact he had not used one. It should be noted that Mrs. Sellers's insinuation that Mr. Sellers had abused Jeremy was not substantiated by any evidence whatsoever. In fact, Mrs. Outz, Mrs. Sellers's own sister, testified that Mr. Sellers was a good father figure for Jeremy.
The children were removed from Mrs. Sellers's custody and placed in the custody of Mrs. Outz by the Department of Human Services on September 12, 1991. The children have been in her custody ever since. Mrs. Outz testified that during this time, Mrs. Sellers visited the children 10-15 times and never had them overnight. She further testified that Mr. Sellers only missed three weekends during this entire time and kept both children overnight on several occasions. *483 By all accounts, both children love Mr. Sellers, and Jeremy, by his own initiative, even calls Mr. Sellers "daddy." Despite these facts, the chancellor awarded custody of the children to Mrs. Outz. This appeal followed.

III.

DISCUSSION OF ISSUE
Mr. Sellers contends that the decision to award custody of Anna to her aunt was based on the chancellor's unwillingness to separate Anna from her half-brother Jeremy. Mr. Sellers argues that in basing his decision on this factor, the chancellor violated the presumption that the child's best interest is placement with the parent or parents.
Mrs. Sellers counters that the chancellor's decision was based not on the fact that the chancellor did not want to separate the children, but rather, on a finding that both parents were unfit to care for the children at the time. Therefore, Mrs. Sellers argues, the problem of separating the children was but one factor in the chancellor's decision to place the children with the maternal aunt.
This Court is bound to uphold the factual findings of a chancellor if the findings are not manifestly wrong or substantially erroneous. Crow v. Crow, 622 So.2d 1226, 1227 (Miss. 1993); Bell v. Parker, 563 So.2d 594, 596-597 (Miss. 1990). However, in the case at bar, the chancellor made no explicit factual finding as to the fitness of either parent, nor did he state whether his custody decision was based on a desire to keep the children together. The chancellor stated in part:
The only issue to be resolved is that of the custody of Anna, the four year old daughter of the parties. I want to discuss this before I announce what the Court must do. In a custody dispute between natural parents, the principal consideration is the best interests of the children. There are several things the Court must consider in trying to arrive at that determination. One of them, and our Supreme Court has discussed this on a number of occasions, is the problem of splitting children. Our Court has frowned on that when any other solution is available.
In this case we have a brother and a sister. Although they are of the half-blood, nevertheless, they are brothers and sisters and will be reared as brothers and sisters. They have a close relationship with each other. This creates a problem for the Court in considering the father's rights to custody of these children because he is not the father of the older child.
The Court feels that splitting these children and placing them in different households would not be a plus point insofar as their welfare is concerned. The Court has no doubt these parents both love this child very dearly. There is no question about that. Anything said here should not suggest that either parent doesn't love this child and does not sincerely want to have her custody. If custody of the child were awarded to the father that would involve splitting this brother and sister because the older child is not the child of this father.
The Court has no jurisdiction over that child in this proceeding. So to award the father the custody of Anna would necessarily divide this brother and sister, putting them in two different households. The father is living alone, has a problem about providing around the clock care for this child. He goes to work early and the child would spend most of every working day with a non-relative neighbor who I believe would take good care of the child but which is not the best of situations.
The father has a stable home environment. That is a plus.
From the mother's standpoint, I see some instability here. I am very much concerned about the incident of alleged child abuse which caused these children to be taken from her home in the first place. She has admitted a long standing adulterous relationship with Mr. Phillips and her testimony, as I recall it, is that this relationship is still ongoing although they do not live together. That in itself is not determinant of legal custody, but it certainly is not a plus point. I think Mrs. Sellers' life is in a state of flux now. Hopefully sometime in the future she will be able to establish a responsible, loving *484 household into which these children might possibly come. I will say the same thing of Mr. Sellers.
Under these circumstances I do not think it would be to the best interest of this child to remove her from the foster home in which she presently lives. Mrs. Utz [sic] is in the courtroom as the Court is making this ruling. She is not a party to this litigation, but she did testify that as to the relationship with these children and I was impressed with her. In the short period of time I heard her testimony I perceived her to feel a real sense of responsibility for these children.
She testified that she is perfectly willing to continue these children in her home as a foster parent. And I will ask Mrs. Utz [sic] now if this correct.
BY THE COURT: Is that your attitude,
Mrs. Utz [sic]?
BY MRS. UTZ [sic]: Yes, sir.
BY THE COURT: All right, it will be the Court's order that the custody of Anna will remain with Mrs. Utz [sic] in the foster home in which she has been placed by the Department of Public Welfare.
I don't suggest that this is a permanent arrangement. I hope that sooner or later these children can be placed with one or the other of their natural parents. But for the time being and until further order of this Court I think it would be to their best interest to remain where they are.
The chancellor granted both parents liberal visitation rights, including the right to have the children with them overnight. In addition, the chancellor ordered both parents to contribute to the children's support.
In custody battles involving a natural parent and a third party, it is presumed that a child's best interest will be served by placement in the custody of his or her natural parent, as against any third party. In order to overcome this presumption there must be a clear showing that the natural parent has 1) abandoned the child; 2) the conduct of the parent is so immoral as to be detrimental to the child; or 3) that the parent is unfit mentally or otherwise to have custody. Keely v. Keely, 495 So.2d 452, 453 (Miss. 1986). See also Carson v. Natchez Children's Home, 580 So.2d 1248, 1257 (Miss. 1991); Matter of Marriage of Smith, 555 So.2d 73, 75 (Miss. 1989).
We have no such general rule regarding the separation of sibling children. We stated in Sparkman v. Sparkman, 441 So.2d 1361, 1362 (Miss. 1983):
This Court has never adopted any per se rule to the effect that children should not be separated, in the absence of a showing of absolute necessity for the child's welfare
...
We did state, however, in Mixon v. Bullard, 217 So.2d 28 (Miss. 1968) albeit by dicta:
The Court shall in all cases attempt insofar as possible, to keep the children together in a family unit. It is well recognized that the love and affection of a brother and sister at the ages of these children is important in the lives of both of them and to deprive them of the association ordinarily would not be in their best interests. 217 So.2d at 30-31.
This expresses a common sense recognition of the ordinary facts of life, that in the absence of some unusual and compelling circumstance dictating otherwise, it is not in the best interest of children to be separated.
Sparkman, 441 So.2d at 1362.
In this case, the children  and the chancellor  were torn between two concerns: that children should be with a natural parent as against a third party, and that siblings should not be required to live apart. In Carson v. Natchez Children's Home, 580 So.2d 1248 (Miss. 1991), we indicated the relative weight of each concern:
Carson's counsel quite correctly begins by reminding us that it is presumed that the best interest of a child will be served by remaining in the custody of the natural parent. Rutland v. Pridgen, 493 So.2d 952, 954 (Miss. 1986). Almost as strong is the imperative that siblings should not be required to live apart. Sparkman v. Sparkman, 441 So.2d 1361, 1362 (Miss. *485 1983); Mixon v. Bullard, 217 So.2d 28, 30-31 (Miss. 1968).
Carson, 580 So.2d at 1257 (emphasis added).
We take this opportunity to clarify that the presumption in favor of awarding custody to a natural parent should prevail over any imperative regarding the separating of siblings. This conclusion supports Mr. Sellers' position on appeal. Nevertheless, Mr. Sellers' assertion that the chancellor based his decision solely on a desire to keep the children together is clearly mistaken. A reading of the chancellor's ruling above reveals that the separation issue was but one of several factors he considered in reaching his decision.
In all child custody cases, the polestar consideration is the best interest of the child. Smith v. Todd, 464 So.2d 1155 (Miss. 1985); Albright v. Albright, 437 So.2d 1003, 1005 (Miss. 1983). In Albright v. Albright, we set forth a number of factors to be considered by chancellors in weighing custody decisions:
The age of the child is ... but one factor to be considered. Age should carry no greater weight than other factors to be considered, such as: health, and sex of the child; a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of parents; the home, school and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent, and other factors relevant to the parent-child relationship.
Albright, 437 So.2d at 1005.
We noted in Smith v. Todd, 464 So.2d 1155 (Miss. 1985) that this list "was surely not intended to be exhaustive but a beginning point ..." Therefore, the chancellor in the case at bar correctly considered several issues in reaching his decision, including the stability of the parties' respective homes, the personal qualities of the parties, and, in addition, the separation of the children. While the chancellor did not base his decision entirely on the separation issue, it is apparent that this was his primary concern and the foundation of his ruling. However important this consideration may be, it may not be used as a basis to deprive a parent of his child in favor of a third party unless the parent has been found unfit.
In Keely v. Keely, 495 So.2d 452 (Miss. 1986), custody of the minor child of divorcing parties was awarded to the maternal grandfather by the Youth Court of Newton County. The Newton County Chancery Court entered a temporary custody order granting custody to the maternal grandfather until the final hearing of the divorce. At trial, the chancellor refused to hear any testimony as to the custody of the child, and allowed the child to remain in the custody of the grandfather, while granting the divorce on the ground of irreconcilable differences. Finding that the chancellor had erred in refusing to allow the father to present evidence concerning custody of his son, we reversed and awarded custody to the father, without prejudice to a third party seeking to overcome the presumption in favor of the natural parent.
In Moody v. Moody, 211 So.2d 842 (Miss. 1968), the appellant father was awarded a divorce on the grounds of adultery. However, the chancellor found that both parents were unfit to have custody of the only child of the marriage, and thus awarded custody to the maternal grandparents. The father appealed to this Court, and we reversed. While recognizing that it is within the power of the chancellor to award custody to a third party when the parents are unfit, we stated that "it is the strong policy of the law of this State that a child shall remain in the custody of one of the parents unless there has been a clear showing that both are unfit." Moody, 211 So.2d at 844 (emphasis added). In interpreting the rational behind this rule, we stated:
The basis for this rule, as we have said many times, is that human experience has demonstrated that as a general rule parental love and solicitude for the child's welfare are the best guarantee that it will be *486 properly cared for and trained for that station in life for which it will likely be best fitted. The presumption in all cases is that the child's parents will love it most and care for it better than anyone else and it is in the best interest of the child to leave it in the custody of a parent. In order to overcome this presumption, there must be a clear showing that the parent is unfit by reason of immoral conduct, abandonment or other circumstances which clearly indicate that the best interest of the child will be served in the custody of another.
Moody, 211 So.2d at 844.
We reversed the chancellor's ruling because there was no evidence of immoral conduct or abandonment, nor was there any showing that the best interest of the child would be served by awarding custody to the grandparents. All testimony presented demonstrated that the appellant loved his son and cared for his welfare; that he was a hard worker, earned enough money to support and educate the child, and that he was morally fit to care for him. Although the appellant worked and someone else had to care for the child during the day, we found that the appellant's mother was physically able and willing to help her son in caring for the child while he worked.
In Hale v. Hood, 313 So.2d 18 (Miss. 1975), a maternal aunt petitioned for custody of her sister's child. Her petition was contested by the child's father, who also sought for custody. At a trial on the merits, the grandmother and mother of the child testified that the father was a fit and proper person to have custody of the child. However, the chancellor awarded custody to the child's maternal aunt, holding that this was in the child's best interest. We reversed and rendered, noting that the trial court "did not find, nor was there evidence to support a finding, that appellant had abandoned the child or that he had been guilty of any immoral conduct or was otherwise unfit to have the custody of the child." Hale, 313 So.2d at 19. We stated:
The well-settled rule in a child custody case between a natural parent and a third party is that it is presumed that the best interest of the child will be preserved by being in the custody of the natural parent. In order to overcome this presumption there must be a clear showing that (1) the parent has abandoned the child, (2) the conduct of the parent is so immoral as to be detrimental to the child, or (3) the parent is mentally or otherwise unfit to have custody of the child. Rodgers v. Rodgers, 274 So.2d 671 (Miss. 1973).
Hale, 313 So.2d at 19-20.
In the case at bar, the chancellor did not clearly hold, nor did the evidence support such a finding, that Raymond was unfit to have custody of his daughter Anna. In fact, all evidence indicated that Raymond was a loving and devoted parent. Evidence showed that Raymond 1) had held the same job for over seven years; 2) had lived in the same home for over two years; 3) regularly took his daughter to church, and 4) missed seeing his daughter for only three weekends for the year Anna was in foster care with Barbara Outz. There were no allegations of abuse, and an expert testified that Raymond was fit to take care of his daughter.
All testimony revealed that Raymond was a good father. Mrs. Outz, Carolyn's own sister, testified that Raymond was a "good father image" and had a good relationship with the children. Barbara Bedwell, Raymond's sister, testified that Raymond had an extremely close relationship with Anna and that Anna appeared to love her father very much. Willie Dean Willis, Raymond's mother, testified that "Raymond is responsible for his child. He has been keeping her and I have seen him with the child. He takes good care of her always. She is first."
In his holding, the chancellor noted that Anna would have to spend much time in the care of a non-relative neighbor while Raymond was at work. However, both Raymond's sister and mother testified that they were willing to help Raymond take care of Anna. In addition, there were no allegations that the neighbor would not take good care of Anna, a fact recognized by the chancellor. Significantly, the chancellor also noted that "the father has a stable home environment."
The only factor weighing against Raymond was his history of marijuana use. However, *487 this fact was not mentioned by the chancellor in his ruling. Raymond testified that after he was refused custody of his children at the original Youth Court hearing, he completely stopped using marijuana. He further testified that he had not used marijuana in over a year, a fact that was not disputed by any party, and also volunteered to submit to drug testing, day or night, if he were awarded custody of Anna. Based on the evidence presented, Raymond appears to have overcome his problem with marijuana.

IV.

CONCLUSION
The chancellor did not find that Raymond was clearly unfit to have custody of his child. In any event, the evidence presented would not have supported such a finding. As a result, the chancellor erred in awarding custody of Anna Sellers to her maternal aunt rather than her father, Raymond Sellers. We therefore reverse and remand for findings on Raymond's current fitness for custody of Anna.
REVERSED AND REMANDED.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and SULLIVAN, PITTMAN, BANKS, and SMITH, JJ., concur.
DAN M. LEE, P.J., specially concurs with separate written opinion joined by BANKS and McRAE, JJ.
DAN M. LEE, Presiding Justice, specially concurring:
I agree with the result reached by my brother, Justice James L. Roberts, Jr., but write separately to explain my rationale.
It is apparent from the chancellor's findings, in this very difficult situation, that the chancellor did consider most of the pertinent factors in reaching a decision that was in the temporary best interest of the children. I quote from his findings:
The Court has no jurisdiction over that child in this proceeding. So to award the father the custody of Anna would necessarily divide this brother and sister, putting them in two different households. The father is living alone, has a problem about providing around the clock care for this child. He goes to work early and the child would spend most of every working day with a non-relative neighbor who I believe would take good care of the child but which is not the best of situations.

The father has a stable home environment. That is a plus.
From the mother's standpoint, I see some instability here. I am very much concerned about the incident of alleged child abuse which caused these children to be taken from her home in the first place. She has admitted a long standing adulterous relationship with Mr. Phillips and her testimony, as I recall it, is that this relationship is still ongoing although they do not live together. That in itself is not determinant of legal custody, but it certainly is not a plus point. I think Mrs. Sellers' life is in a state of flux now. Hopefully sometime in the future she will be able to establish a responsible, loving household into which these children might possibly come. I will say the same thing of Mr. Sellers.
Under these circumstances I do not think it would be to the best interest of this child to remove her from the foster home in which she presently lives. Mrs. Utz [sic] is in the courtroom as the Court is making this ruling. She is not a party to this litigation, but she did testify that as to the relationship with these children and I was impressed with her. In the short period of time I heard her testimony I perceived her to feel a real sense of responsibility for these children.
(emphasis added)
This was intended as a temporary order as indicated by the chancellor's statement that, "[h]opefully sometime in the future she will be able to establish a responsible, loving household into which these children might possibly come. I will say the same thing of Mr. Sellers."
The chancellor indicated that his order did not mandate a permanent arrangement and that he hoped that these children would be *488 placed with one of their natural parents at some future date, stating that:

I don't suggest that this is a permanent arrangement. I hope that sooner or later these children can be placed with one or the other of their natural parents. But for the time being and until further order of this Court I think it would be to their best interest to remain where they are.
(emphasis added)
Therefore, I believe that, at that time, the chancellor did, at least on a temporary basis, the very best he could in arriving at a solution that is in the overall best interest of these children, while reserving the option to look at the situation at a later time for a more permanent solution. The learned chancellor, faced with this difficult situation, observed their demeanor and listened to the testimony of the witnesses. Being fully advised of all the circumstances then and there existing, the chancellor made his findings, and those findings should not be disturbed. Hammett v. Woods, 602 So.2d 825, 827 (Miss. 1992) (citing Clark v. Myrick, 523 So.2d 79, 80 (Miss. 1988)). "This Court will not disturb those findings, unless manifestly wrong, clearly erroneous, or an erroneous legal standard is applied." Faries v. Faries, 607 So.2d 1204, 1208 (Miss. 1992) (citing Hill v. Southeastern Floor Covering Co., 596 So.2d 874, 877 (Miss. 1992)).
In keeping with the chancellor's announcement that his ruling represented a temporary arrangement and the indication that he needed to review the situation after the father and mother had stabilized or changed their circumstances, the best interest of the children was protected. I would affirm his temporary order, but concur that this cause should be remanded for the chancellor to determine the best interest of the children in light of circumstances existing some 2 years after the June 3, 1992 trial.
BANKS and McRAE, JJ., join this opinion.