# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-CA-01309-SCT

*HELEN BARNETT*

*v.*

*CHARLES E. OATHOUT*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/18/2001 |
| TRIAL JUDGE: | HON. JOHN C. ROSS, JR. |
| COURT FROM WHICH APPEALED: | LEE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | GARY L. CARNATHAN |
| ATTORNEYS FOR APPELLEE: | DAVID LEE ROBINSON |
| | ALLISON FARESE THOMAS |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | REVERSED AND REMANDED - 10/30/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     Aggrieved by the Lee County Chancery Court's entry of a final judgment which, inter alia, found that the best interest of two minor children would be served by returning them to their natural father, the minor children's foster mother has appealed to us for relief. Finding that the chancellor applied the wrong legal standard for modification of the prior custody order, we are constrained to reverse the chancellor's decision and remand this case for further consideration by the chancellor.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2.　　Charles E. Oathout (Charles) and Brenda Oathout Newcomb (Brenda)[1] were married on March 31, 1994, and three children were born to this union; namely, Tyler, born January 5, 1995, Brendan, born October 27, 1995, and Jessica, born in the summer of 1998.[2] Charles and Brenda were divorced on October 22, 1998. Prior to Jessica's birth, Tyler and Brendan were removed from the Oathouts' home under allegations of medical neglect. Both boys suffered severe medical problems, including asthma and hydrocephalus, and neither were properly receiving their breathing treatments at the Oathout home. Both were admitted to the hospital. On April 17, 1996, the boys were placed in the foster home of Helen Barnett (Helen). Tyler was approximately fifteen months old, and Brendan was approximately five and one-half months. Thereafter, Tyler underwent a medical procedure in Memphis to install a shunt due to the hydrocephalus. Brendan has been monitored to see if he will require the same surgery.

¶3.　　In October, 1996, Tyler was returned to Charles's mother, Carolyn Oathout Motley (Carolyn); however, Brendan remained with Helen due to his medical condition. Helen continued to provide Tyler's transportation for medical appointments. In March, 1997, Carolyn found Charles openly using marijuana in Tyler's presence. In April, 1997, Carolyn petitioned the Lee County Youth Court for custody of the boys. Tyler remained with Carolyn; Brendan remained with Helen until June. DHS retained custody. Even though Carolyn had physical custody, the boys frequently stayed with Helen due to Carolyn's work schedule.

------

[1]Brenda has since remarried.

[2]We do not find Jessica's exact date of birth in this record. We do find in the record certain testimony that gives us Jessica's approximate birth date. Charles testified that on February 10, 1999, Jessica was six months old. This would mean her month/year of birth was August, 1998. However, Sonia Sanderson, a social worker with the Mississippi Department of Human Services, testified that Jessica was born on June 6, 1998.

¶4.    In June, 1998, Helen received physical custody of Brendan.  Helen and Carolyn had joint physical custody of Tyler.  Under this order, Carolyn was to provide twenty-four hours' notice to Helen for weekend visitation of Tyler, and forty-eight hours' notice for weekday visitation.  Problems arose because notice was not provided. During mid-1998, the Foster Care Review Board recommended that DHS begin termination of parental rights.  Instead, durable legal custody was granted to Helen of both boys in December 1998 pursuant to Miss. Code, § 43-21-609 (Rev. 2000).  Charles agreed to the granting of durable legal custody.

¶5.    Thereafter, Charles and Carolyn initiated the underlying custody proceedings in December of 1998. An Agreed Order of Visitation was entered into in January, 1999.  In July, 2000, Charles filed a Motion for Custody Modification.  A three-day trial was held in this matter.  The chancellor entered a twenty-five page opinion on July 18, 2001, awarding Charles custody of the boys.  The chancellor denied reconsideration on August 7, 2001.  Helen timely appeals those orders.

**STANDARD OF REVIEW**

¶6.    "A chancellor's decision cannot be disturbed 'unless the chancellor abused his discretion, was manifestly wrong or clearly erroneous, or an erroneous legal standard was applied." *Blevins v. Bardwell*, 784 So.2d 166, 168 (Miss. 2001) (quoting *Madden v. Rhodes*, 626 So.2d 608, 616 (Miss. 1993)).  "The chancellor has the sole responsibility to determine the credibility of witnesses and evidence, and the weight to be given each." *Lee v. Lee*, 798 So.2d 1284, 1288 (Miss. 2001) (citing *Chamblee v. Chamblee*, 637 So.2d 850, 860 (Miss. 1994)).  "[W]e will not arbitrarily substitute our judgment for that of a chancellor who is in the best position to evaluate all factors relating to the best interest of the child." *Ash v. Ash*, 622 So.2d 1264, 1266 (Miss. 1993) (quoting *Yates v. Yates*, 284 So.2d 46, 47 (Miss. 1973)).

3

## ANALYSIS

¶7. Although Helen presents us with several assignments of error, we need only address one.

### I. WHETHER THE CHANCELLOR APPLIED THE CORRECT LEGAL STANDARD

¶8. Helen asserts that the chancellor placed too much emphasis on the natural parent presumption in awarding custody of the boys to Charles. In ordinary circumstances, the rights of a third-party custodian are inferior to that of a natural parent. This Court adopted the natural parent presumption in 1900 and held that:

> Children must and ought to be subject to the custody and control of those who are immediately responsible for their being, for the reason that by nature there has been implanted in the human heart those seeds of parental and filial affection that will assure to the infant care and protection in the years of its helplessness ... that the primary object is the interest of the child, the presumption of the law is that its interest is to be in the custody of its parent.

*Hibbette v. Baines*, 78 Miss. 695, 29 So. 80, 81 (1900) (quoting *Weir v. Marley*, 12 S.W. 798, 800 (Mo. 1890)). As the times have changed, so has the law.

¶9. In addressing the natural parent presumption, this Court noted:

> [I]t is presumed that the best interests of the child will be preserved by it remaining with its parents or parent. In order to overcome this presumption there must be a clear showing that the parent has (1) abandoned the child, or (2) the conduct of the parent is so immoral (as) to be detrimental to the child, or (3) the parent is unfit mentally or otherwise to have the custody of his or her child.

*Grant v. Martin*, 757 So.2d 264, 265 (¶ 5) (Miss. 2000) (quoting *McKee v. Flynt*, 630 So.2d 44, 47 (Miss. 1993)). In *Grant*, the biological parents relinquished full custody of the children to the children's grandparents. Four years later, the biological mother attempted to regain custody. We announced a new standard concerning custody matters between a natural parent and third-parties:

4

Therefore we adopt a new standard and hold that a natural parent who voluntarily relinquishes custody of a minor child, through a court of competent jurisdiction, has forfeited the right to rely on the existing natural parent presumption. A natural parent may reclaim custody of the child only upon showing by clear and convincing evidence that the change in custody is in the best interest of the child. This new rule not only reaffirms that the polestar consideration in all child custody cases is the best interest of the child, but also gives the chancellor the authority to make a "best interest" decision in voluntary relinquishment cases without being fettered by the presumption in favor of natural parents which applies in other child custody cases.

*Grant v. Martin*, 757 So.2d at 266 (¶ 10). In so holding, we likewise stated:

Our law clearly has a strong presumption that a natural parent's right to custody is superior to that of third parties, ***whether grandparents or others***.
*******************
While we do not want to discourage the voluntary relinquishment of custody in dire circumstances where a parent, for whatever reason, is truly unable to provide the care and stability a child needs, neither do we want to encourage an irresponsible parent to relinquish their child's custody to another for convenience sake, and then be able to come back into the child's life years later and simply claim the natural parents' presumption as it stands today.

757 So.2d at 266 (¶ 9) (emphasis added). Justice McRae summed up the matter in his separate opinion

by saying:

We would be remiss to allow a parent to perpetually rely on the presumption in their favor after voluntarily relinquishing custody and practically abandoning the children for four years. Such a holding would deny the chancery court the power to provide for the best interests of the minor children.

*Id.* at 267 (¶ 14) (McRae, J., concurring in part and dissenting in part).

¶10.    It is likewise obvious that *Grant* applies to the case sub judice, notwithstanding the fact that Helen

is a foster parent as opposed to a person related by blood or marriage to the minor children. Our decision

in *Grant* was published approximately three months before the hearing on the underlying matter. Thus,

in the case before us today, the burden was on Charles to show by clear and convincing evidence that a

change in custody would be in the best interest of the children. In December, 1998, Charles agreed to the

court's granting of durable custody to Helen Barnett. Note the following exchange between Charles and his own attorney on direct examination:

> Q: And did you agree to give durable custody to Helen Barnett in December of 1998?
>
> A: Yes, ma'am, I did.

There is no doubt that the chancellor erroneously applied the natural parent presumption in favor of Charles.

¶11. The durable legal custody granted to Helen was done so under authority of Miss. Code Ann. § 43-21-609 (Rev. 2000), which provides:

> In neglect and abuse cases, the disposition order may include any of the following alternatives, giving precedence in the following sequence:
>
> (a) Release the child without further action;
>
> (b) Place the child in the custody of his parents, a relative or other person subject to any conditions and limitations as the court may prescribe. If the court finds that temporary relative placement, adoption or foster care placement is inappropriate, unavailable or otherwise not in the best interest of the child, durable legal custody may be granted by the court to any person subject to any limitations and conditions the court may prescribe; such durable legal custody will not take effect unless the child or children have been in the physical custody of the proposed durable custodians for at least one (1) year under the supervision of the Department of Human Services. The requirements of Section 43-21-613 as to disposition review hearings does not apply to those matters in which the court has granted durable legal custody. In such cases, the Department of Human Services shall be released from any oversight or monitoring responsibilities;
>
> (c) Order terms of treatment calculated to assist the child and the child's parent, guardian or custodian which are within the ability of the parent, guardian or custodian to perform;
>
> (d) Order youth court personnel, the Department of Human Services or child care agencies to assist the child and the child's parent, guardian or custodian to secure social or medical services to provide proper supervision and care of the child;

(e)     Give legal custody of the child to any of the following but in no event to any state training school:

    (i)     The Department of Human Services for appropriate placement; or

    (ii)    Any private or public organization, preferably community-based, able to assume the education, care and maintenance of the child, which has been found suitable by the court. Prior to assigning the custody of any child to any private institution or agency, the youth court through its designee shall first inspect the physical facilities to determine that they provide a reasonable standard of health and safety for the child.

¶12.    A guardian ad litem, J. Mark Shelton, was appointed to represent the boys in the underlying proceeding. His report concluded that Charles "fails to take into consideration the damage which could be caused to the children by taking them from their 'home.' There has clearly been too much instability in the lives of these children, and such a move can only be harmful to their emotional well-being." Despite considering and agreeing with the report of the guardian ad litem, the chancellor "differ[s] with him in the ultimate opinion in this matter."

¶13.    Indeed, these two boys have had much instability in their short lives. At the time of the hearing in July of 2001, Helen had durable legal custody of both boys for approximately two and one-half years. At that point, Tyler was nearly six and one-half years old; Brendan was almost six. Prior to the award of durable legal custody in December, 1998, both boys were living with Helen for the second time. Neither boy had resided with Charles since being taken away in April of 1996 under allegations of abuse and medical neglect.

¶14.    The boys were originally placed into Helen's custody in April of 1996 after both boys were in the hospital. Custody of Tyler was given to Charles's mother, Carolyn, in October of 1996. At that time, Helen retained custody of Brendan due to medical reasons. Custody of Brendan was given to Carolyn in

June, 1997. Immediately, Helen began babysitting them until custody of both were returned to Helen in June of 1998, because Carolyn informed DHS that she could no longer provide care for the children. During the time periods that the children were under the care of Helen, Charles had very little to do with the children and provided virtually no financial support.

¶15. In spite of this, the chancellor ordered a change of custody back to the biological father based upon a material and substantial change of circumstances caused by Helen's actions which had adversely affected the children; therefore, he held that it would be in the best interests of the children to return custody to their biological father. The adverse actions of Helen include her strong negative feelings toward Charles, placing a block on her telephone, prohibiting visitation on certain occasions, and failure to inform Charles of the children's progress in school and school activities.

¶16. The chancellor further went to great lengths to outline Charles's change of circumstances. Again, this is placing too much emphasis on the natural parent presumption. While it is commendable that the biological father is making improvements in his life, the polestar consideration is the best interests of the children. On the surface, it is evident that both the biological father and the foster mother love these boys dearly; however, they fail to see the effect that their words and actions are having on the emotional well-being of each of the children.

## CONCLUSION

¶17. Because the chancellor applied an incorrect legal standard, this Court reverses the chancellor's decision and remands this matter back for further proceedings consistent with this opinion. There is no need to address the remaining issues. Given the passage of time since the appeal was taken, and since the subject matter concerns the lives of two young boys, the best interests of the children should be viewed at this point in time.

¶18.    **REVERSED AND REMANDED.**

**PITTMAN, C.J., SMITH, P.J., WALLER, COBB AND EASLEY, JJ., CONCUR. McRAE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES, J. DIAZ, J., NOT PARTICIPATING.**

**McRAE, PRESIDING JUSTICE, DISSENTING:**

¶19.    The majority fails to adhere to the age old doctrine of this State which encourages the reunification of families separated by child protective services. Admittedly, Charles Oathout ("Charles") has a sketchy past. However, under the facts and circumstances presented, Charles, the biological parent, should be afforded the opportunity to be reunited with his children since he was not the cause of their removal by child protective services, he has remained in constant contact with his children, and he has shown himself to be a loving and responsible parent. The learned chancellor, after reviewing all the evidence and testimony, correctly found that Charles should be granted custody and control of his children. For these reasons, I dissent.

**I.    DID THE CHANCELLOR APPLY THE CORRECT LEGAL STANDARD?**

¶20.    Of first importance, is whether the chancellor applied the correct legal standard when reviewing the evidence and testimony presented at trial.

¶21.    The appropriate legal standard developed by this Court is as follows: "In custody battles involving a natural parent and a third party, it is presumed that a child's best interest will be served by placement in the custody of his or her natural parent, as against any third party. In order to overcome this presumption there must be a clear showing that the natural parent has 1) abandoned the child; 2) the conduct of the parent is so immoral as to be detrimental to the child; or 3) that the parent is unfit mentally or otherwise to have custody." *Sellers v. Sellers*, 638 So.2d 481, 484 (Miss. 1994) (citing *Keely v. Keely*, 495

So.2d 452, 453 (Miss. 1986)). *See also Carson v. Natchez Children's Home*, 580 So.2d 1248, 1257 (Miss. 1991); *Matter of Marriage of Smith*, 555 So.2d 73, 75 (Miss. 1989); *Rutland v. Pridgen*, 493 So.2d 952, 954 (Miss. 1986); *Thomas v. Purvis*, 384 So.2d 610, 611 (Miss. 1980); *Rodgers v. Rodgers*, 274 So.2d 671, 673 (Miss. 1973). "[T]he natural parent is entitled to custody, as against a third party, unless one of the above conditions is clearly proved." *Rutland*, 493 So.2d at 954. Additionally, "if the circumstances are such that the restoration of the child to the custody of the parent would probably result in serious detriment to the welfare of the child, the court may properly refuse to order the child to be restored to the custody and control of the parent." *Hill v. Mitchell*, 818 So.2d 1221, 1222 (Miss. Ct. App. 2002) (citing *Governale v. Haley*, 228 Miss. 271, 87 So.2d 686, 687-88 (1956)). It is well settled that the polestar consideration in any child custody matter is the best interest and welfare of the child. *Albright v. Albright*, 437 So.2d 1003, 1005 (Miss. 1983); *Sanford v. Arinder*, 800 So.2d 1267, 1271 (Miss. Ct. App. 2001).

¶22.     Both Charles and Helen Barnett ("Helen"), in their briefs, state that the applicable legal standard for child custody modification is "(1) proving a material change in circumstances which adversely affects the welfare of the child and (2) finding that the best interest of the child requires the change." *Smith v. Jones*, 654 So.2d 480, 486 (Miss. 1995). *See also Touchstone v. Touchstone*, 682 So.2d 374, 377 (Miss. 1996); *In Interest of R.D.*, 658 So.2d 1378, 1387 (Miss. 1995). This legal standard has been found to apply when a natural parent is in a custody dispute with the Department of Human Services, but has not been the legal standard applied when a natural parent is in a custody dispute with a third party. *Id.* at 1387. "The principle that there must be a material change of circumstances which adversely affects a child's welfare before a custody decree may be modified only applies between parents of the child. The

correct application of the law as between grandparents (also other persons) and parents is stated in *Rodgers*, the parent is entitled to custody of the child unless he/she has abandoned the child or is unfit to have custody, keeping in mind the best interest of the child." *Thomas*, 384 So.2d at 611.

¶23.     The chancellor in his opinion and order cited no case law regarding the legal standard in which he used in making his decision. However, the chancellor's findings of fact follow the applicable legal standard.

¶24.     Furthermore, the majority adopts the standard set forth in *Grant v. Martin*, 757 So.2d 264 (Miss. 2000). However, the application of that legal standard contradicts the very purpose of the foster care system – the reunification of families. A full reading of *Grant* leads to the conclusion that its application is not warranted under the present circumstances.

¶25.     In *Grant*, Robin Humphrey and Scott Martin relinquished custody of their three children to Scott's parents in 1993. *Id.* at 264. In 1995, Scott and Robin divorced and signed a settlement agreement whereby they both agreed that "custody of their three minor children should remain with the paternal grandparents, subject only to reasonable visitation rights." *Id.* at 265. Thereafter, Robin remarried and filed a petition in chancery court for modification of the custody order and for dissolution of the guardianship and return of her three children. *Id.* The chancellor denied Robin's petition finding that she had "failed to prove a material change in circumstances which adversely effects the welfare of the minor children." *Id.* On appeal, the Court of Appeals reversed and rendered the case finding that the trial court had failed to apply the correct legal standard and Robin was entitled to regain custody. *Id.* at 266. The Court of Appeals found that a natural parent's bid for custody must prevails absent a showing of abandonment or

11

unfitness. We granted certiorari and found that the case should indeed be reversed and remanded with

a new legal standard. *Id.* We specifically stated:

> we find that it was error for the Court of Appeals to reverse and render when there has not
> been a full hearing on the merits of this case. The only testimony heard in the trial court
was from the natural mother and her husband. . . . . . . we take this opportunity to consider the proper
standard to be applied in a request for modification where the moving natural parent, or parents, have
previously relinquished custody. **Our law clearly has a strong presumption that a natural parent's right to custody is superior to that of third parties, whether grandparents or others. This is as it should be.** However, this Court has never before been asked to rule on whether the natural parent's consent to and joinder in court proceedings granting custody to such third parties should alter that presumption. **Because stability in the lives of children is of such great importance, we have carefully weighed the impact of establishing an exception, or a new standard, for such instances. While we do not want to discourage the voluntary relinquishment of custody in dire circumstances where a parent, for whatever reason, is truly unable to provide the care and stability a child needs, neither do we want to encourage an irresponsible parent to relinquish their child's custody to another for convenience sake, and then be able to come back into the child's life years later and simply claim the natural parents' presumption as it stands today.**

> Therefore we adopt a new standard and hold that a natural parent who voluntarily
> relinquishes custody of a minor child, through a court of competent jurisdiction, has
> forfeited the right to rely on the existing natural parent presumption. A natural parent may
> reclaim custody of the child only upon showing by clear and convincing evidence that the
> change in custody is in the best interest of the child. This new rule not only reaffirms that
> the polestar consideration in all child custody cases is the best interest of the child, but also
> gives the chancellor the authority to make a "best interest" decision in voluntary
> relinquishment cases without being fettered by the presumption in favor of natural parents
> which applies in other child custody cases.

*Id.* (emphasis added).

¶26. Clearly, the standard adopted by this Court in *Grant* was not intended to apply to the present

circumstances. Here, Charles, the natural parent, did not "irresponsibly" relinquish his rights to his children.

At the time when he consented to the children's placement in the foster care system and up until now,

Charles was not in the position to regain custody and provide the appropriate financial needs for his boys.

Both required extensive medical treatment, and Charles had no insurance and no way of placing them in

a daycare which was capable of dealing with their health problems. This is a case where under "dire

circumstances," a father voluntarily relinquished custody of his boys in an attempt to better their lives and assure they received appropriate medical treatment. Charles stayed in constant contact with the boys and has since reclaimed his life and is now financially secure for their return.

## II. APPLYING THE CORRECT LEGAL STANDARD, DOES THE EVIDENCE SUPPORT THE CHANCELLOR'S FINDINGS?

¶27. Using the applicable legal standard, the chancellor's findings of fact support the order granting Charles custody and control of the children.

¶28. A natural parent is entitled to the presumption that it is in the child's best interest to be placed with the natural parent. *Sellers*, 638 So.2d at 484; *Keely*, 495 So.2d at 453. As the natural father, Charles is entitled to the presumption in his favor. The chancellor found that "it would be in the children's best interest to be returned to their natural father."

¶29. In order to overcome the presumption there must be a clear showing that the natural parent has 1) abandoned the child; 2) the conduct of the parent is so immoral as to be detrimental to the child; or 3) that the parent is unfit mentally or otherwise to have custody. *Sellers*, 638 So.2d at 484 (citing *Keely*, 495 So.3d at 453). An evaluation of the facts and application of these three factors supports the conclusion that Charles, the natural father, is still entitled to the natural parent presumption.

### A. ABANDONMENT OF THE CHILD

¶30. "Abandonment must be proven by clear and convincing evidence." *Ethredge v. Yawn*, 605 So.2d 761, 764 (Miss. 1992); *Hill*, 818 So.2d at 1222. In evaluating abandonment "[a] court should objectively determine 'whether under the totality of the circumstances, be they single or multiple, the natural parent has manifested his severance of all ties with the child.'" *Ethredge*, 605 So.2d at 764. Also, "[w]here a natural parent voluntarily gives up custody, the parent would be required to show 'by clear and

13

convincing evidence that the change in custody would serve the best interest of the child.'" *Grant*, 757 So.2d at 266; *Hill*, 818 So.2d at 1225.

¶31.     We have provided several different definitions for abandonment. In *Smith v. Watson*, 425 So.2d 1030, 1035 (Miss. 1983), this Court defined abandonment as: "where a parent, without just cause or excuse, forsakes or deserts his infant child for such a length of time, and under such circumstances, as to show an intent to shirk or evade the duty, trouble or expense of rearing it, or a callous indifference to its wants, or a reckless disregard for its welfare, he or she is guilty of such abandonment." In *Ethredge*, this Court defined abandonment as "any course of conduct on the part of a parent evincing a settled purpose to forgo all duties and relinquish all parental claims to the child." 605 So.2d at 764. Further, abandonment "may result from a single decision" or "may arise from a course of circumstances." *Ethredge*, 605 So.2d at 764.

¶32.     The chancellor's findings of fact and the evidence presented at trial show that Charles has not abandoned his two boys. Since 1996 when the boys were taken into custody by DHS, he has exercised visitation with the boys. When the boys were placed in the custody of Motley, Charles's mother, he spent time with the boys and helped keep the boys while his mother worked. Once his mother was unable to care for the boys and Helen was given custody, Charles frequently visited and phoned the boys. In 1999, when Helen would no longer allow Charles to exercise voluntary visitation, he petitioned the court for an order granting him visitation. Additionally in 2000, when Helen attempted to have visitation discontinued due to allegations of abuse, Charles petitioned the court for temporary visitation pending the outcome of the abuse charge. The court granted Charles supervised visitations. In June 2000, Charles was able to resume unsupervised visitation with the boys. The guardian ad litem even recognized that "Chuck has exercised substantially all of the visitation which he has been awarded by this court."

¶33.    Whenever possible, Charles is involved in the boys' daily lives and decisions. Despite Helen's discouragement, Charles stays in touch with the boys on a regular basis through telephone conversations. Additionally, he has contacted the boys' physicians attempting to stay informed of their medical conditions. Charles has also requested Helen keep him informed of the boys' school progress and activities.

¶34.    Helen has consistently thwarted Charles's efforts to stay involved with his children. Besides disrupting visitation efforts, she has refused to keep Charles informed of the medical conditions and treatments of the boys. She also refused to allow the boys to attend their grandmother's wedding. Additionally, she refused Charles visitation the weekend of the youngest's birthday knowing they had a party planned for him. She has also blocked Charles's home phone number in attempts to keep him from contacting the boys. The boys' doctors have also informed him that Helen has requested no medical information be given to him. Charles was also uninvited to his child's head start graduation.

¶35.    Charles has also contributed financially to help meet the needs of the boys. He has voluntarily paid child support to Helen. Currently, the boys are covered under Charles's health insurance. He also buys the boys clothes, toys, and other necessities.

¶36.    The only evidence tending to show any abandonment by Charles is the durable legal custody order. At the time when Helen was granted durable legal custody, the youth court was called upon to determine allegations of abuse during visitation but instead decided to grant Helen legal custody. This might explain why the order was uncontested because it was done without any notice given to Charles.

¶37.    The chancellor's findings show no indication of abandonment by Charles.

**B.    PARENTAL CONDUCT IS IMMORAL OR TO THE DETRIMENT OF THE CHILD**

15

¶38. It is true that Charles has a sketchy past, but evidence presented at trial did not establish that his parental conduct is immoral or to the detriment of the children. In fact, the chancellor found and testimony presented at trial showed a devoted father who has turned his life around to better himself and unify his family.

¶39. In the last year, Charles has married. His wife, Karlene, and he have a newborn baby girl and two children from her previous marriage. They live in a three-bedroom mobile home with plans to renovate and add an additional bedroom once the boys are allowed to come home. The home sits on acreage in the country near his wife's relatives and is completely paid for. The children enjoy playing with their cousins and with one another. Charles is attending church. He routinely takes his children to church and is involved in youth activities. Additionally, he and his wife enjoy educational outings with the children. They have taken the children to the zoo, the library, and a rodeo. One of the boys has been diagnosed with attention-deficit/ hyperactivity disorder ("ADHD") and is in need of special help with learning. Charles and his wife provide support and spend extra time with him to help him overcome his learning disability.

¶40. During visitations, Charles and the boys are involved in many activities. They go out to eat, visit with family, go to the park and church events, go to the library for story time, and attend fairs, festivals, and ball games. Visiting with family has always been a priority during their visitation time.

¶41. Additionally, Charles has complied with both mandatory and voluntary parenting classes and counseling. In 1997, Charles completed a mandatory DHS parenting class. During 1999 and into 2000, Charles voluntarily completed 40 additional parenting classes. In 2000, Charles voluntarily completed drug and alcohol counseling. He has passed all random drug tests given to him. Also, he has voluntarily sought family and individual counseling.

¶42.    When the boys misbehave, Charles disciplines the children.  Charles and Karlene discipline the children through the use of time-outs and by taking away privileges.  They never spank the children.

¶43.    Since Charles has been exercising visitation with the boys, he has administered their medicine and breathing treatments.  He is careful never to miss a treatment and is sure to keep up to date on the administration of their medication.  His wife, a licensed LPN, is experienced with dealing with children with bronchial and asthma problems and is able to help care for the children's medical problems.

¶44.    Charles has already looked into schooling for the boys.  One would be attending a local kindergarten and be in the same class as Karlene's youngest daughter.  Also, the school provides the speech therapy that he needs.  The other will be starting at the local head start.  Charles also plans on continuing family therapy with the boys.

¶45.    Much testimony was given as to the boys' emotional and mental health.  The three counselors that testified have inconsistent conclusions.  Walker, a marriage and family therapist, administered family and individual counseling with the boys.  He reported that the boys parrot Helen.  The boys repeat bad things Helen says about their father.  She encourages the boys to call him "Chuck" instead of "daddy" and encourages them to refer to her as "mother."  She also encourages the boys to call her husband "daddy."  The children's school emergency card lists the Barnetts as the "mother" and "father" and makes no mention of them being foster parents.  He also found that the younger son sleeps with Helen every night.  Walker stated that the eldest son suffers from depression and his anxiety about the visitations is caused by Helen's discouragement.  He testified that the boys are excited about seeing their father and expressed that they would like to live with their father.  He concluded that the boys should be returned to their father.

¶46.    Heines, a clinical social worker at Mantachie Clinic, and Dr. Porter, a psychologist at Mantachie clinic, evaluated the boys at the request of Helen.  Heines testified that Helen did most of the talking at their

sessions. She concluded that the eldest suffers from depression and the youngest shows signs of ADHD. She believes the visitations are emotionally affecting the boys. She testified that the boys told contradictory stories about alleged abusive acts. She acknowledged that lack of support with regard to visitation can have a negative impact on the boys mentally and emotionally. She testified that Helen's negative feelings toward Charles are affecting the boys. Her conclusion was that the boys should continue to live with Helen and receive therapy. Dr. Porter testified that the eldest has cognitive limitations and that the youngest is the assertive one. She found no signs of the youngest suffering from depression. She testified that a lack of emotional support toward the visitation can cause the boys emotional problems. She acknowledged that the boys seemed to be parroting Helen. She concluded that the boys should continue to live with Helen and receive therapy.

¶47. Testimony was also given as to the boys' emotional response to visitation with their father. Charles testified that the boys were always excited to see him and wanted to stay for longer visits. Flanagan, the visitation supervisor, testified that the boys were always excited to be with their father. Karlene testified that the children are excited to spend time with the family during visitation. Robinson, a Lee County social worker, testified that the boys have a strong bond with their father. Heines testified that the boys have a strong bond with their father. Dr. Porter testified that the boys are no different emotionally before or after visitation and, that, therefore, the visitation is not emotionally affecting the boys.

¶48. Helen argues that Karlene's smoking intensifies the boys' medical conditions. Smoking may intensify the boys' condition, but Karlene does not smoke around the boys or even in her home. Helen offered testimony of a private investigator that said he had seen her smoking with the boys in a van. But contrary evidence presented at trial showed that the van in question has not run in quite some time. Additionally, Helen's own relatives and children smoke around the boys.

18

¶49. Helen also argues that Charles's past incidents of alleged abuse and neglect show that giving him custody of the children would be detrimental to them. She argues that the boys were taken away because of medical abuse and neglect and they still come home sick from visitations. Helen testified that she is the one who provides medical care for the boys. Testimony at trial revealed that the incident that caused the boys to be taken away due to medical neglect was caused by Newcomb, Charles' ex-wife and mother of the boys. She admitted on direct examination that she failed to give the boys their breathing treatments. Also evidence presented showed that Charles has been very diligent in giving the boys their medications and treatments.

¶50. Helen also points to the alleged abuse charge against Charles for the injuries sustained by Jessica, his daughter. Testimony at trial showed that those charges were dismissed and Charles passed a polygraph test proving that Jessica's medical condition was not caused by him. Further, testimony revealed that the alleged perpetrator was a babysitter. Sanderson, a DHS social worker, recommended Jessica be returned to Charles but a question regarding paternity had held up this recommendation. Since then, Charles has been found not to be the natural father of Jessica, but he continues to fight for custody and is currently paying child support.

¶51. Helen claims that while she has had custody of the boys, they have come home from visitation with bruises and burns complaining of abuse. She has repeatedly reported Charles to DHS claiming he is abusing the children during visitation. Robinson, a Lee County social worker, testified that Helen never let the boys tell the story of alleged abuse in their own words, she always told the story for them. The allegations have been investigated, and most have found to be without merit. On one occasion, Helen claimed the youngest had been burned by a cigarette, but testimony showed that he had fallen on a tree limb while climbing and scratched his arm. The couple of injuries found to be substantiated have not been

19

linked to Charles but rather have been inconclusive as to the alleged cause of the injuries. The chancellor's findings and evidence presented at trial show no evidence of immoral conduct or behavior detrimental to the children.

### C. THE PARENT IS UNFIT MENTALLY OR OTHERWISE TO HAVE CUSTODY

¶52. The chancellor's findings show no evidence of Charles being unfit mentally or otherwise. In the past Charles may not have been mature enough to handle children with such severe medical problems, but his age and experience have resulted in a complete turn around.

¶53. Charles has recently married and has a new daughter. He has a stable job where he has earned two promotions and has good benefits. He attends church and is involved in numerous church activities. He does not drink or use drugs. Charles and his wife have close, extended families and enjoy having family functions.

¶54. Also, Charles has been evaluated by Walker, a licensed marriage and family therapist. Walker found him to be a devoted parent who is eager to restore his family. Walker conducted a home study in which he visited Charles's home and evaluated its safety. He also administered several random drug tests which Charles passed. Walker stated that Charles had a "mild depressive disorder" that makes him "just melancholy, little bit of sadness sometimes in his overtones."

¶55. Charles and his wife are careful to follow all directions regarding the children's medical treatment. His wife, a licensed LPN, is confident that she is able to handle all medical problems that may arise. Additionally, Charles is eager to be involved in the children's medical care.

¶56. Helen argues that Charles and his wife provide an unstable environment for the children. She argues that the children learn curse words at their home and have complained of abuse. Testimony at trial

showed that the boys learned curse words from Helen's daughter and husband. Karlene also testified that when dropping off the boys after a weekend visitation, Helen's daughter gave them the "bird" in front of all the children.

¶57.    Helen further alleges that she is more financially able to provide for the boys. She points out that at her home the boys have their own rooms. This may be so, but she has 6 people living in her home. Charles would have 7 people living in his home with plans to add an additional room onto the house. Helen is also disabled and relies on social security and SSI benefits received for the boys. Charles has a steady job and his wife plans to go back to work part time after her maternity leave. This Court has also stated that "[t]he best interest of a child does not mean a bigger home, a finer automobile, a color television or more money." *Thomas*, 384 So.2d at 613.

¶58.    Evidence also showed that Helen shows favoritism toward the youngest by buying him nicer things and disciplining the eldest more often. For Christmas both boys requested scooters, but only the youngest was given one. In a letter from Helen to Motley, when Motley had custody of the boys, Helen requested contact and visitation with the youngest only.

¶59.    The chancellor's findings and the evidence presented show Charles to be a fit father deserving of custody of his children.

### III.    DID THE CHANCELLOR PLACE TOO MUCH EMPHASIS ON THE NATURAL PARENT PRESUMPTION?

¶60.    The chancellor did not place too much emphasis on Charles's status as the natural father of the children. The courts have long recognized the importance of family autonomy. The Supreme Court has held that "a natural parent's 'desire for and right to the companionship, care, custody, and management of

21

his or her children' is an interest far more precious than any other property right." ***Lassiter v. Dep't of Soc. Servs.***, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (quoting ***Stanley v. Illinois***, 405 U.S. 645, 651, 92 S.Ct 1208, 31 L.Ed 2d 551(1972)). This Court has emphasized the importance of the natural parent child relationship by the creation of a natural parent presumption. ***Governale***, 87 So.2d at 689.

¶61.    The importance of the natural parent's status is recognized in the state Youth Court statutes. "The goal of the State Department of Human Services shall be to return the child to its natural parent(s) or refer the child to the appropriate court for termination of parental rights and placement in a permanent relative's home, adoptive home or foster/adoptive home within the time periods specified." Miss. Code Ann. § 43-15-13(3). "The department's first priority shall be to make reasonable efforts to reunify the family when temporary placement of the child occurs or shall request a finding from the court that reasonable efforts are not appropriate or have been unsuccessful." *Id.* § 43-15-13(8). "The Department of Human Services shall require the following responsibilities from participating foster parents: (e) Recognizing that the foster family will be one of the primary resources for preparing a child for any future plans that are made, including return to birth parent(s), termination of parental rights or reinstitutionalization; (h) Cooperating with any plan to reunite the foster child with his birth family and work with the birth family to achieve this goal." *Id.* § 43-15-13(2)(e) & (h). "The Department of Human Services shall establish a foster care placement program for children whose custody lies with the department, with the following objectives: (d) Restoring to their families children who have been removed, by the provision of services to the child and the families when the child can be cared for at home without endangering the child's health and safety." *Id.* § 43-15-13(2)(d). The public policy of this State is to encourage the reunification of the family and emphasize the importance of the natural parents.

¶62.    Additionally, Helen argues and the majority obviously agrees that her status as custodian under a durable legal custody order should be considered equal to that of Charles's natural parent presumption. Such a finding is without merit. Looking to the definition of durable legal custody leads to the conclusion that her status is far inferior to that of a natural parent. "Durable legal custody" means the legal status created by a court order which gives the durable legal custodian the responsibilities of physical possession of the child and the duty to provide him with care, nurture, welfare, food, shelter, education and reasonable medical care. All these duties as enumerated are subject to the residual rights and responsibilities of the natural parent(s) or guardian(s) of the child or children." *Id.* § 43-21-105(y). Also, recently this Court stated that "the intent of durable legal custody is merely to avoid the required annual dispositional reviews by the youth court and constant oversight and monitoring by DHS, not a complete preclusion of the court's jurisdiction, DHS's further involvement or court ordered review hearings as needed." *In re S.A.M.*, 826 So.2d 1266, 1279 (Miss. 2002).

¶63.    In his opinion, the chancellor gave 23 reasons why changing custody in favor of Charles, the natural father, was in the children's best interest. The chancellor did not over- emphasize Charles's status as the natural father.

### IV.    DID THE CHANCELLOR PLACE TOO MUCH EMPHASIS ON CHARLES'S PRESENT FITNESS AS A POSITIVE CHANGE IN CIRCUMSTANCE?

¶64.    The chancellor did not incorrectly place too much emphasis on Charles's current fitness and positive lifestyle change. The applicable legal standard calls for consideration of the natural parent's current moral conduct and current parental fitness. *Hale*, 313 So.2d at 19-20. This Court in *Touchstone,* acknowledged the importance of a parent's rehabilitation and present fitness as a major factor for consideration. 682 So.2d at 377. Certainly, the chancellor considered Charles's past conduct, and it

factored into his decision making. The chancellor gave a list of 12 positive changes that favor giving custody to Charles. The chancellor concluded that "Charles E. Oathout has sincerely and substantially changed his circumstances and proven to this court that he is now worthy of caring for his two children." The chancellor correctly considered Charles's current moral character and fitness.

¶65. Despite the majority's contentions, the chancellor properly granted Charles Oathout custody and control of his two minor children. The fact that the chancellor failed to indicate any legal standard in his opinion does not make the outcome incorrect. We can glean it from the record. The chancellor's findings of fact and the evidence at trial support the order granting Charles custody. Accordingly, I would affirm the judgment below. For these reasons, I dissent.

**GRAVES, J., JOINS THIS OPINION.**