# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2018-CA-00962-SCT

*APRIL QUEN GARNER (JAIME GARCIA)*

*v.*

*JUDI L. GARNER, RONALD CLYDE FOX AND DAVID SMITH*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/16/2018 |
| TRIAL JUDGE: | HON. PERCY L. LYNCHARD, JR. |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JERRY WESLEY HISAW |
| ATTORNEY FOR APPELLEES: | GORDON C. SHAW, JR. |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART; AND REVERSED AND REMANDED IN PART - 10/03/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**GRIFFIS, JUSTICE, FOR THE COURT:**

¶1. April Garner appeals the chancellor's custody modification awarding custody of her minor child to the child's uncle, the award of grandparent visitation to the child's step-grandfather, a finding of contempt, and the assessment of various fees and costs. Because the chancellor properly modified custody and found April in contempt but lacked the authority to award grandparent visitation to a step-grandparent, we affirm in part and reverse and render in part. We reverse and remand in part because the chancellor erred, in part, in the assessment of fees and costs.

## FACTS AND PROCEDURAL HISTORY

¶2.     Andrew[1] was born in August 2009 to April Garner.[2]  On November 8, 2010, when Andrew was fifteen months old, April voluntarily relinquished physical custody of Andrew to her brother Jason.  At that time, Jason was dating and living with David Smith.  Jason and David later married on September 20, 2012.

¶3.     April was granted supervised visitation with Andrew, by agreement, on October 1, 2012. In January 2013, Andrew began treatment with Dr. Peter Zinkus, a clinical psychologist specializing in behavioral- and emotional-development disorders in children. Dr. Zinkus diagnosed Andrew with separation-anxiety disorder due to the "alternating visitation."

¶4.     On December 20, 2013, by agreed order, April regained legal and physical custody of Andrew.  The order stated that the parties "recognize[d] that in order for [Andrew] to successfully handle his separation anxiety he must maintain a relationship with David and David must have a secure and regular place in the child's life."  The agreed order provided David extensive visitation, which April acknowledged was "similar to what a biological parent would get."

¶5.     At some point in 2013, April began a relationship with Pablo Garcia.  Their daughter Allison[3] was born on November 5, 2014.

¶6.     In November 2014, April withheld visitation with Andrew from David.  As a result,

---

[1] For privacy purposes, we substitute a fictitious name for the minor child.

[2] Andrew's natural father's parental rights were terminated.

[3] For privacy purposes, a fictitious name is substituted for the minor child.

David moved to enforce the December 20, 2013 agreed order. In March 2015, the chancellor upheld the agreed order and visitation continued between David and Andrew.

¶7. In September 2015, Jason died from complications of HIV.[4]

¶8. On September 19, 2016, David filed an "amended petition for emergency custody and to cite [April] for contempt."[5] In the petition, David alleged that based on various events and admissions, April was "unfit to care for [Andrew]." He further alleged that April unilaterally had discontinued Andrew's counseling sessions with Dr. Zinkus, in violation of the December 20, 2013 agreed order. April's mother and stepfather, Judi Garner and Ron Fox, filed a similar petition for custody and joined David's petition. Shortly thereafter, on September 21, 2016, April and Pablo were married.

¶9. The chancellor issued a temporary restraining order on September 22, 2016, and granted temporary custody of Andrew to David. April later filed an answer to David, Judi, and Ron's petitions. She further moved for a modification of the December 20, 2013 agreed order and sought to terminate David's visitation rights with Andrew.

¶10. Based on the allegations asserted in David's amended petition, the chancellor appointed a guardian ad litem (GAL) on September 29, 2016, to investigate the allegations and to make a recommendation to the court. The chancellor also ordered the parties to submit to a drug test.

¶11. Based on the GAL's recommendation, the chancellor entered a temporary order that

---

[4] It is undisputed that David is HIV negative

[5] An original petition for custody was filed on or about September 13, 2016. Before it was served, David filed the amended petition.

allowed alternate weekly visitation between April and David, with grandparent visitation to Judi and Ron during the weeks Andrew was with David. On October 13, 2016, April tested positive for cocaine. The GAL later moved for supervision of April's visitation based on her failed drug test and the GAL's belief that April was coaching Andrew. April's visitation with Andrew was supervised until February 3, 2017.

¶12. In the fall of 2017, April reported or assisted in reporting two separate allegations of child sexual abuse against David, one on September 11, 2017, and the other on November 14, 2017. Both reports involved similar allegations of bathing, specifically, that David inappropriately touched Andrew while giving him a bath. As a result, Andrew was placed in foster care pending further investigation of the abuse allegations.

¶13. Both allegations were separately investigated by the Mississippi Department of Child Protection Services (CPS). The November investigation included a forensic interview with Andrew. At the completion of the investigations, both reports of sexual abuse were found to be unsubstantiated. Specifically, CPS concluded that "there were no inappropriate actions on behalf of David."

¶14. A trial in this matter was held on February 22 and 23, 2018. On April 4, 2018, the chancellor issued an opinion in which he found that April had entered into a course of conduct since the entry of the December 20, 2013 agreed order that constituted a material change in circumstances adverse to Andrew's best interests and that made April "mentally and morally" unfit to have custody of Andrew. Following an *Albright* analysis,[6] the

---

[6] *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983).

chancellor awarded "full care, custody[,] and control" of Andrew to David and visitation to April. The chancellor further awarded grandparent visitation to Judi and Ron.

¶15. Additionally, the chancellor found that April was in contempt of the December 20, 2013 agreed order due to her unilateral withdrawal of Andrew from Dr. Zinkus's care. The chancellor assessed attorneys' fees and costs against April and denied April's request for attorneys' fees.

¶16. An order reflecting the chancellor's rulings was filed April 16, 2018. An amended final order was filed July 6, 2018, that specifically addressed the amount of fees and costs assessed against April.

¶17. April moved for reconsideration, which was denied. April now appeals and argues the chancellor erred by: (1) awarding third-party custody to David, (2) awarding grandparent visitation to Ron, (3) holding her in contempt, (4) assessing fees and costs against her, and (5) failing to award her attorneys' fees. Judi and Ron do not contest the award of custody to David. Instead, they join David's arguments on appeal.

**STANDARD OF REVIEW**

¶18. "The standard of review in child custody cases is quite limited." ***Johnson v. Gray***, 859 So. 2d 1006, 1012 (Miss. 2003). "A chancellor must be manifestly wrong, clearly erroneous, or apply an erroneous legal standard in order for this Court to reverse." ***Id.*** (citing ***Mabus v. Mabus***, 847 So. 2d 815, 818 (Miss. 2003)). "[F]indings of fact made by a chancellor may not be set aside or disturbed upon appeal if they are supported by substantial, credible evidence." ***Id.*** (internal quotation marks omitted) (quoting ***Marascalco v.***

*Marascalco*, 445 So. 2d 1380, 1382 (Miss. 1984)).

**DISCUSSION**

> I.      *Whether the chancellor erred by awarding third-party custody to David*.

¶19.    April argues the chancellor erroneously modified and awarded third-party custody to David.  "In order for child custody to be modified, a noncustodial party must prove (1) there has been a substantial change in the circumstances affecting the child; (2) the change adversely affects the child[]'s welfare; and (3) a change in custody is in the best interest of the child." *Id.* (citing *Bredemeier v. Jackson*, 689 So. 2d 770, 775 (Miss. 1997)).  "'Above all, in "modification cases, as in original awards of custody, we never depart from our polestar consideration: the best interest and welfare of the child.""'" *Riley v. Doerner*, 677 So. 2d 740, 744 (Miss. 1996) (quoting *Ash v. Ash*, 622 So. 2d 1264, 1266 (Miss. 1993)).

¶20.    Additionally, because this case involves a custody dispute between a natural parent and a third party, it is important to remember the well-settled presumption regarding the natural-parent.  "The law recognizes that parents are the natural guardians of their children, and 'it is presumed that it is in the best interest of a child to remain with the natural parent as opposed to a third party.'" *Davis v. Vaughn*, 126 So. 3d 33, 37 (Miss. 2013) (quoting *In re Dissolution of Marriage of Leverock and Hamby*, 23 So. 3d 424, 429 (Miss. 2009)).  However, the natural-parent presumption may be rebutted by clear and convincing evidence that: "(1) the parent has abandoned the child; (2) the parent has deserted the child; (3) the parent's conduct is so immoral as to be detrimental to the child; or (4) the parent is unfit, mentally or otherwise, to have custody." *Id.* (internal quotation marks omitted) (quoting

6

*Smith v. Smith*, 97 So. 3d 43, 46 (Miss. 2012)). "If the natural-parent presumption is successfully rebutted, the court may then proceed to determine whether an award of custody to the challenging party will serve the child's best interests." *Id.* (citing *Smith*, 97 So. 3d at 46). In other words, "[i]n a custody case involving a natural parent and third party, the court must first determine whether through abandonment, desertion, or other acts demonstrating unfitness to raise a child . . . , the natural parent has relinquished his [or her] right to claim the benefit of the natural-parent presumption." *Leverock*, 23 So. 3d at 431. "If the court finds one of these factors has been proven, then the presumption vanishes, and the court must go further to determine custody based on the best interests of the child through an on-the-record analysis of the *Albright* factors." *Id.* (footnote omitted) (citing *In re Custody of M.A.G.*, 859 So. 2d 1001, 1004 (Miss. 2003)).

¶21. Thus, the first issue this Court must consider is whether April relinquished her right to claim the benefit of the natural-parent presumption.

### A. Natural-Parent Presumption

¶22. The chancellor found that the following conduct by April was detrimental to Andrew's best interests:

1. Addiction to illegal drugs and alcohol;

2. Placing the child in a home fraught with acts of domestic violence and disturbance as a result of her relationship with her now husband, Pablo Garcia, both during this marriage and particularly prior thereto when they resided together without the benefit of marriage;

3. Transient moving of the child from school to school on at least three occasions over [a] three[-]year period of time resulting in the child's progress being underdeveloped based upon his age and grade in school

7

presently [sic];

4.  Refusing . . . [to] seek further medical and psychological help for her diagnosis of depression and bipolar disorder resulting in her aggressive, paranoid[,] and bizarre behavior at times;

5.  Cavorting with a known illegal immigrant with full knowledge of his status . . . ;

6.  Refusal to seek permanent employment though she readily admits she is full[y] capable of doing so, preferring instead to live below the poverty level as indicated [i]n her [Mississippi Uniform Chancery Court Rule] 8.05 financial statement filed as evidence herein; [and]

7.  Conduct that evinces a callous regard for the mental well being of the child by refusing to participate in counseling with the minor child and withdrawing the child from the care of his normal counselor, Dr. Peter Zinkus, for no apparent or explained reason, resulting in a setback of his progress in dealing with a separation anxiety disorder as per the testimony of Dr. Zinkus[.]

¶23.   April asserts the chancellor's "finding of unfitness was improper." We disagree. For the sake of brevity, we separately address only those categories of conduct that are the most applicable to the issues in this case.

*1.    April's Addiction to Drugs and Alcohol*

¶24.   April claims "there [is] no evidence that [she] currently has a drug problem." While April denies a *current* drug addiction, she acknowledges a drug problem before and shortly after this action was filed in September 2016. Indeed, April tested positive for cocaine in October 2016.

¶25.   Additionally, the record shows that April has a history of alcohol abuse. At trial, multiple witnesses testified regarding April's alcohol use and various incidences of intoxication. The trial testimony indicates that April was intoxicated at Judi's birthday party

8

in June 2016 and again at Andrew's birthday party in August 2016. April's oldest son testified that April was "belligerently drunk" at Andrew's birthday party, which made Andrew "very upset." He further testified that his relationship with his mother was "spotty" due to her "drinking problem."[7]

¶26. Moreover, Andrew advised the GAL that he sees April drink, that she drinks all the time, and that she is "crazy" when she drinks. Andrew stated that April refers to alcohol as her "medicine" and "apple juice." The GAL's report notes that April took money out of Andrew's piggy bank in order to purchase beer.

¶27. Although April briefly participated in a drug- and alcohol-treatment program through her church, the program ended in December 2017 and is no longer available. April did not seek treatment from another facility and is not currently in treatment for drugs and/or alcohol, despite stating, "once an addict, always an addict." Instead, April asserts that she does not need treatment for her drug and alcohol addictions because she is cured. Specifically, April asserts that "God has healed [her] from all of [her addictions]."

¶28. Yet, by her own admission, April continued to consume alcohol until September 2017, just five months before trial. Additionally, April was prescribed narcotics and opiates, including Demerol and Hydrocodone, for an eye injury in June 2017.[8] While April was sober and drug free throughout the course of trial, the trial testimony indicates that April has a repeated pattern of sobriety, followed by relapse.

---

[7] April acknowledged that she lost custody of her oldest son due to drug and alcohol issues.

[8] April did not advise her doctor of her history of drug addiction.

9

¶29.    In *Sellers v. Sellers*, 638 So. 2d 481, 487 (Miss. 1994), a case on which April relies, this Court found that the chancellor erroneously awarded custody of the minor child to her maternal aunt rather than her father. In *Sellers*, "[t]he only factor weighing against [the father] was his history of marijuana use." *Id.* at 486. The Court noted that although the father had a history of marijuana use, he "had not used marijuana in over a year . . . ." *Id.* at 486-87. The father testified that after he was refused custody of his children, "he completely stopped using marijuana." *Id.* at 487.

¶30.    Here, unlike in *Sellers*, no evidence was presented that April has "overcome [her] problem with [drugs and alcohol]." *Id.* at 487. While the record shows April passed all drug tests after October 2016, she admittedly took prescription narcotics and opiates in 2017. She further admitted to continued alcohol use just before trial. April voluntarily relinquished custody of Andrew when he was fifteen months old due to her drug and alcohol problems. Yet the record reflects that even after she regained custody of Andrew in 2013, April continued to use drugs and to consume alcohol. In fact, April tested positive for cocaine and admittedly consumed alcohol even after David petitioned for custody. Thus, unlike the parent in *Sellers*, it does not appear that the potential loss of custody, for the second time, is enough to deter April's drug and alcohol use, especially considering her lack of treatment. Additionally, unlike in *Sellers*, many factors, not just her history of drug and alcohol use, weigh against April.

2.    *Domestic-Violence Issues Between April and Pablo*

¶31.    April contends the chancellor's consideration of domestic violence was in error. We

10

disagree.

¶32. The record reflects multiple incidences of domestic violence throughout the relationship. For instance, in January 2016, April and Pablo got into an altercation at a bar. After leaving the bar, Pablo rammed his truck into the back of April's vehicle, then backed up and rammed the vehicle again. In February 2016, April locked Pablo out of the house following an altercation. Pablo broke a window in order to get back into the house. In June 2016, April, as well as Andrew and Allison, stayed at David's house due to "issues with Pablo" and "issues with alcohol." April filed a protective order against Pablo in June 2016, but she withdrew the order based on allegations that Pablo had tried to kill her.

¶33. April acknowledged that, during 2016, the police were called to her house "for disturbances between [her] and Pablo." Despite these domestic-violence issues, April married Pablo on September 21, 2016, just days after David filed his petition for custody.

¶34. April admits that her relationship with Pablo was "volatile" at times but only "before [they] were married." Yet the record shows that the volatile behavior continued after their marriage. In 2017, while April, Pablo, Andrew, and Allison were temporarily living with Pablo's brother, the police were called to the house based on a "disturbance" between April and Pablo. Additionally, in June 2017, April was unable to meet David to exchange visitation due to an eye injury. At first, April claimed she had fallen and injured her eye. However, during her deposition and at trial, April claimed her eye injury occurred when she was hit by a "two-by-four" while visiting Pablo at a job site. April acknowledged that there were no "lines like a two-by-four" around her eye, no bruising around the eye area, and no

11

broken or fractured bones. Instead, only April's eye was bruised and swollen. Despite April's assertion, medical testimony indicated that April's eye injury was inconsistent with being hit by a two-by-four. The medical testimony showed that her eye injury was "more consistent with a round . . . object" such as "a fist" or "a knee."

¶35. In addition to the domestic-violence issues between April and Pablo, the record indicates that Pablo would "discipline" Andrew by spanking Andrew on the bottoms of his feet with a "bad belt." Andrew described the "bad belt" as having Mexican dogs on it. Dr. Zinkus found that such spanking was "unnecessary and border[ed] on abusive." He explained that "the reason we spank children, if we do spank children, on the rear end is because it's padded. . . . [I]f you want to inflict pain, you find an area that's not padded and has lots of small bones in it, and you could certainly inflict pain on a child."

¶36. On one occasion, April and Andrew were at Judi's house when Andrew complained of his feet hurting. Judi told Andrew to take off his shoes, but April would not allow it. When asked about the incident, April explained that they had just arrived at Judi's house and were not staying long, so there was no point in Andrew's taking off his shoes. She further stated that Andrew's feet were hurting because his shoes were too small. While April admitted that Pablo disciplined Andrew at times, she denied ever seeing Pablo spank Andrew on his feet. But April agreed that she is not always around Pablo when he disciplines Andrew and, as a result, does not know what happens when the discipline occurs outside her presence.

¶37. Andrew advised the GAL that April and Pablo fight all the time. Andrew further

advised that April scares him and that he has seen April chase Pablo with a knife. During a later meeting with the GAL, Andrew advised that April yelled at him to tell the judge that she never chased Pablo with a knife. While Andrew was adamant that the incident occurred, he stated that he did not want to tell the judge about the incident because "it really hurts when his feet get spanked."

¶38. Additionally, the chancellor heard testimony from Andrew's foster parent Anne Dodds. Anne testified that Andrew is "most comfortable with David" and "tells [her] everyday" that "[h]e wants to go home with David." Conversely, Anne testified that Andrew gets "extremely nervous" before his visits with April. Based on her observations of Andrew, Anne believes Andrew loves his mother but is "afraid of her."

¶39. In support of her assertion that the chancellor erroneously considered the domestic-violence issues as evidence of her unfitness, April relies on *Moody v. Moody*, 211 So. 2d 842 (Miss. 1968). In *Moody*, the father "admitted that he had a high temper and did have difficulty in controlling it." *Id.* at 843. But "there was no evidence that his high temper in any way affected his treatment of his child." *Id.*

¶40. Here, unlike in *Moody*, April denies any domestic-violence issues with Pablo since their marriage, despite her mysterious eye injury in 2017. She further denies that Pablo hits Andrew on the bottoms of his feet as a form of discipline, despite Andrew's disclosure of such conduct to multiple people. Moreover, unlike in *Moody*, the record shows that April and Pablo's volatile relationship adversely affects Andrew, who sees them fighting "all the time" and is "scare[d]." As with her drug and alcohol issues, April simply refuses to

13

acknowledge that her relationship with Pablo is unhealthy not only for her but also for her child.

### 3. *April's Mental Health*

¶41. April asserts she "did not have significant mental health issues at the time of trial." Yet April admitted that she was diagnosed with depression and bipolar disorder. In August 2016, Andrew and Allison stayed with David at David's house for a few days as a result of April's depressive state. April, who was admittedly depressed, asked David for money to buy a gun. Additionally, in September 2016, April advised CPS that she was battling depression.

¶42. Despite these mental-health issues, April was not on any medication and was not receiving treatment. Instead, April claims she does not need medication or treatment because she is "well." As with her drug and alcohol addictions, April claims that God healed her depression and bipolar disorder.

### 4. *April's Refusal to Participate in Counseling with the Child and Her Withdrawal of the Child from Counseling with Dr. Zinkus*

¶43. Dr. Zinkus began treating Andrew in January 2013 and diagnosed Andrew with separation-anxiety disorder. According to Dr. Zinkus, Andrew was afraid he would never again see David. Under the December 20, 2013 agreed order, Andrew was to "continue monthly visits with Dr. Zinkus until he [wa]s released by Dr. Zinkus or referred to another treating doctor."

¶44. Dr. Zinkus's treatment plan for Andrew's separation anxiety included meetings with

14

both David and April to discuss problems they were encountering with Andrew. Dr. Zinkus explained that treatment went well and that both April and David communicated and worked together until May 2015. According to Dr. Zinkus, on May 1, 2015, April arrived early for an appointment and was irritated and advised that she could no longer communicate or work with David. Thereafter, April unilaterally discontinued Andrew's monthly visits with Dr. Zinkus. Dr. Zinkus did not see Andrew again until November 21, 2016.

¶45. April asserts that she did not refuse to conduct counseling with Andrew. However, it is undisputed that Dr. Zinkus did not release Andrew or refer him to another treating physician. Although April asserts she took Andrew to Dr. Wayne Lancaster based on a referral by Andrew's pediatrician, the referral was made at April's request. Once April decided she could no longer communicate with David, she unilaterally withdrew Andrew from Dr. Zinkus's care, after more than two years of treatment, without notice to Dr. Zinkus, David, or the court. In other words, April was unable to set aside her personal issues with David to do what was clearly in her child's best interests.

¶46. Dr. Zinkus opined that "having both parents present in the treatment plan was essential" in treating the separation-anxiety disorder. According to Dr. Zinkus, because of April's failure to participate in Andrew's therapy, the parties were unable to "optimiz[e] the opportunities to help [Andrew]." He explained that April's discontinued treatment was potentially psychologically harmful to Andrew because it "created an ongoing instability in his life."

¶47. The chancellor determined that "[t]hese findings taken collectively as a whole and

15

considered in the totality of the circumstances show by clear and convincing evidence" that

April is unfit to have custody of Andrew. The chancellor noted,

> Though [April] argues . . . that she has defeated her addictions with the help
> of God and her church without medical or psychological help and the
> relationship with her now husband is synonymous to that of Ozzie and
> Harriett, the [c]ourt does not accept that as proven or true. Though it is
> certainly acknowledged by this [c]ourt that the Almighty has that power within
> himself to do so at his prerogative, having witnessed [April]'s demeanor and
> heard her testimony from the stand, the [c]ourt is unconvinced that this has
> occurred. Further, as it is for the chancellor to determine the credibility and
> weight of [the] evidence, *Chamblee v. Chamblee*, 637 So. 2d 850, 860 (Miss.
> 1994), the [c]ourt finds [April's] credibility as perceived by the [c]ourt is
> minimal at its very best. Accordingly, the [c]ourt is unwilling to risk the
> adolescent years of this child on a promise by a mother who bears a track
> record in the past of falling back into the same actions and conduct after short
> terms of positive progress. . . . Without professional help with these addictions
> and illnesses, the [c]ourt sees little chance of her permanently overcoming
> either.

¶48. Upon review, we agree and find that clear and convincing evidence was presented

regarding April's unfitness. Accordingly, the chancellor's finding that the natural-parent

presumption was successfully rebutted is supported by substantial evidence in the record and

is not manifestly wrong or clearly erroneous.

### B.    *Custody to David—***Albright** *Analysis*

¶49. Following his determination that April had relinquished her right to the natural-parent

presumption, the chancellor considered "whether an award of custody to [David] w[ould]

serve the child's best interests." *See **Davis***, 126 So. 3d at 37 ("If the natural-parent

presumption is successfully rebutted, the court may then proceed to determine whether an

award of custody to the challenging party will serve the child's best interests." (citing ***Smith***,

97 So. 3d at 46)); *see also **Leverock***, 23 So. 3d at 431 ("If the court finds one of these factors

16

has been proven, then the presumption vanishes, and the court must go further to determine custody based on the best interests of the child through an on-the-record analysis of the *Albright* factors." (footnote omitted) (citing *M.A.G.*, 859 So. 2d at 1004)).

¶50. In *Albright*, 437 So. 2d at 1005, this Court enumerated various factors that must be considered in child custody determinations. Those factors include (1) the age, health, and sex of the child; (2) the continuity of care before the separation; (3) the parenting skills and the parent's capacity to provide primary childcare; (4) the employment of the parent and the responsibilities of that employment; (5) the physical and mental health and age of the parent; (6) the emotional ties of parent and child; (7) the moral fitness of the parent; (8) the home, school, and community record of the child; (9) the preference of the child; (10) the stability of the home environment; and (11) other factors relevant to the parent-child relationship. *Id.*

¶51. The chancellor considered the applicable *Albright* factors and found that "the best interest of the child w[ould] be served by placing him in the full care, custody[,] and control of David . . . ." April asserts the "chancellor erred in his *Albright* analysis." We disagree and find that the chancellor's overall findings are supported by substantial evidence in the record.

*(1)    Age, Health, and Sex of the Child*

¶52. The chancellor found that Andrew's age favored neither party, that his health favored David due to the separation anxiety suffered as a result of his absence from David, and that his sex favored David as a male influence. April argues, "it was error for the chancellor to favor David on this factor" since Andrew also suffers separation anxiety as a result of being

17

away from her. April relies on a letter from Dr. Lancaster, dated September 22, 2016, in which he noted how close Andrew is to his mother. However, the report does not reference Andrew's separation-anxiety disorder. Moreover, the report was never admitted into evidence at trial, and Dr. Lancaster did not testify. Instead, the report was attached to April's motion to dissolve the temporary restraining order issued by the chancellor.

¶53. April further argues that Pablo is a "male presence" in Andrew's life. However, the record shows Pablo's presence is not a positive one.

### (2) Continuity of Care

¶54. The chancellor found that this factor favored David, since "the child has resided in the home where [David] was present more so than that of [April] . . . ." April asserts that she has had custody of Andrew since December 20, 2013, and argues, "[t]he chancellor incorrectly used evidence prior to the last court order to find that David was favored under [this factor]." We disagree.

¶55. While April regained custody of Andrew by agreement in December 2013, David continued to have extensive visitation with the child. Moreover, following the agreed order in December 2013, David, at April's request, kept Andrew and Allison at his house on several occasions due to April's depression and turbulent relationship with Pablo. Thus, as noted by the chancellor, "[w]hen extended periods of visitation are considered, the continuity of care was most often with [David] . . . ."

### (3) Parenting Skills and Capacity to Provide Primary Childcare

¶56. The chancellor found that this factor favored David and noted that David had provided

Andrew with psychological care at his own expense, had taken Andrew to a specialist for allergies, had cared for Andrew on numerous occasions when April was unwilling or unable to do so, and had provided private-school tuition for Andrew at two separate schools. April disagrees and asserts that "[a] homemaker is favored over a working individual as they are able to provide full-time child care." April relies on *Cavett v. Cavett*, 744 So. 2d 372 (Miss. Ct. App. 1999). But April's reliance on *Cavett* is misplaced. *Cavett* does not suggest that simply because April is a stay-at-home mother, she has better parenting skills or is more willing to provide primary care for Andrew.

¶57. The trial testimony shows that while in April's care, Andrew complained of an ear ache. April testified that she took Andrew to the doctor for an ear infection. However, her testimony was contradicted by text-message correspondence that showed that David was the one who initiated treatment for the ear infection. When presented with the correspondence and asked if she recalled the conversation, April simply responded, "not particularly."

> (4) *Employment of the Parent and the Responsibilities of That Employment*

¶58. The chancellor noted that April was unemployed, which would normally allow her to be in a better position to give care and support to her child. However, because April was "unemployed at her own instance, doing so has forced her and her children to live in poverty and rely on public assistance rather than earn an income." "[Al]though [David] is employed, he has a job that allows him to have the child in his custody without restriction as to job responsibilities . . . ." As a result, the chancellor found that this factor favored David.

¶59. April argues this factor should have favored her, since she is a "homemaker" and is

19

"able to provide full-time child care." Once again, April relies on *Cavett* in support of her argument. However, as previously noted, simply because she is a homemaker does not automatically weigh in her favor. Moreover, the record shows that April struggles to financially care for her children. While David is employed full time, he has the ability to adjust his work schedule to ensure that he is able to provide for Andrew.

### (5) Physical and Mental Health and Age of the Parents

¶60. The chancellor found the age factor to be neutral but noted that April's "mental disorders, untreated and uncured along with her addiction to alcohol and drugs[,] which remain unchecked except by the possible, but not probable, grace of God . . . , makes her unfit mentally and accordingly renders her at the bottom of this [c]ourt's consideration of this factor . . . ." April asserts that "this factor should have been neutral" and argues, "the fact that a parent has experienced mental or emotional problems does not bar custody unless the parent's present ability to care for the child is affected." April relies on *Tritle v. Tritle*, 956 So. 2d 369 (Miss. Ct. App. 2007).

¶61. In *Tritle*, the chancellor found that the mental-health factor did not weigh against the mother simply because she "once took Paxil for panic attacks." *Id.* at 377. The court found that there was no testimony that the mother's use of Paxil affected her ability to care for her children. *Id.* Here, the record shows that April's untreated mental-health issues affected her ability to care for Andrew. Indeed, the record shows that David, on numerous occasions, kept both Andrew and Allison while April battled depression. At one point, while admittedly depressed, April asked David for money to purchase a gun.

20

¶62. April further relies on ***McCraw v. McCraw***, 841 So. 2d 1181, 1184 (Miss. Ct. App. 2003), in which this Court found that a previous commitment to a mental-health facility for depression did not weigh against the mother. Yet, in *McCraw*, the parent had recovered from her mental illness. ***Id.*** Here, there is no evidence, other than April's own self-serving testimony, that April has recovered from depression and bipolar disorder, especially in light of the fact that she has not received medical or psychological treatment for either illness.

*(6)      Emotional Ties of Parent and Child*

¶63. The chancellor noted that Andrew was "loved by all the parties equally" but determined that "because of the separation anxiety suffered by the child as a result of being away from [David] and the attachment to him as testified by the expert, Dr. Peter Zinkus, this factor must be resolved in favor of [David]." April argues, "[t]his factor should have been equal to both parties." April relies on the previously referenced letter from Dr. Lancaster, in which Dr. Lancaster had stated that Andrew is "very close" to his mother.

¶64. As previously stated, the letter was not admitted into evidence at trial and Dr. Lancaster did not testify at trial. Moreover, contrary to April's assertion, the letter does not state that Andrew "misse[s] his mom and sister." Moreover, in the letter, Dr. Lancaster emphasized that his "observations" in no way represented an opinion regarding custody.

*(7)      Moral Fitness of the Parents*

¶65. The chancellor determined this factor favored neither April nor David. April argues this factor should have favored her over David, since she is a "devout Christian" who "no longer drinks alcohol, takes drugs, or smokes," and David is an "open homosexual" who

21

"does not attend church."

¶66.    Although testimony was adduced that April regularly attends church, further testimony showed that April has a pattern of recovery and then relapse due to her drug and alcohol problems.  April herself acknowledged at trial that it had only been a few months since she last consumed alcohol.

¶67.    Additionally, David's sexuality is not, and has never been, a secret.  April knew that David was in a same-sex relationship when she voluntarily relinquished custody of Andrew to her brother Jason who was dating David.  Jason and David later married.

¶68.    If April had any concerns about David's moral fitness due to his sexuality, she should have addressed those concerns in 2010, before she voluntarily relinquished custody of Andrew, or in 2013, before she agreed to extensive visitation between Andrew and David. We simply do not accept April's attempt now to use against David something that was previously known to her to which she consented.  Also, although David does not attend church, he testified that he is a Christian.

¶69.    The dissent disagrees with the chancellor's findings that David's homosexual lifestyle called his moral fitness into question.  Diss. Op. ¶ 125.  The dissent relies on **Obergefell v. Hodges**, 135 S. Ct. 2584, 2599, 192 L. Ed. 2d 609 (2015), which legalized same-sex marriage.  Diss. Op. ¶ 126.  However, the record shows that although David is in a same-sex relationship, he is not married.  Moreover, on appeal, David admits that there is support for the chancellor's findings on this factor.  Specifically, David asserts that although he does not agree with the chancellor's determination of this factor, he "cannot assign error to the

22

chancellor's analysis of this factor as there is evidence to support this finding on the record." David concludes that "the chancellor did not commit manifest error in examining this factor."

¶70. Even assuming the chancellor did err in his examination of this factor, any such error was harmless, as the chancellor awarded custody to David. Clearly David's sexuality did not affect the chancellor's custody decision, since the chancellor awarded custody of Andrew to David.

### (8) Home, School, and Community Record of the Child

¶71. The chancellor found this factor was "neutral." The chancellor noted David's extended care of Andrew, which "signifie[d] his commitment to a stable home." The chancellor found April's "transferring the child on a regular basis to different schools work[ed] to her detriment" and noted that "[a]lthough [April] has extended family for the child, i.e., the grandparents[,] [who] are available to assist her with the child . . . , she has alienated her parents from the child as a form of punishment to them for what she sees as 'meddling' or interfering with her care of the child." Notwithstanding April's conduct, the chancellor noted that April has "engage[d] the child in religious training, an element that improve[d] her standing . . . ."

¶72. April does not assert any error regarding this factor.

### (9) Preference of the Child

¶73. The chancellor properly found that this factor was inapplicable because Andrew was under the age of twelve. *See* Miss. Code Ann. § 93-11-65(1)(a) (Rev. 2018); ***Albright***, 437 So. 2d at 1005.

¶74.    The chancellor found this factor favored David.  Specifically, the chancellor found

as follows:

> [April] has entered into relationship with a man who is illegal and prone to violence toward her.  She has only recently married him though they lived together for a number of years, despite this propensity.  She has caused the child to be removed from school on three occasions since his enrollment in kindergarten.  As stated earlier, though she confesses to be able to work, she has chosen to not do so preferring again to live with little income at the expense of the taxpayers of the State of Mississippi by drawing food stamps and insuring the health of the child through Mississippi's CHIPS program.  These elements are not supportive of the stability of the home environment in her favor.  Conversely, [David] has resided in his home alone since the death of his husband prior to the last order.  Though he is involved in a relationship with another man that is intimate in nature, his partner does not reside with him and there is no evidence that [David] has allowed this element of their relationship to be observed by the child.  This fact has already been assessed against [David] with reference to the moral fitness factor at any rate.  He is stable in his employment and earns a substantial wage with nothing to indicate that his employment is in jeopardy in any manner.

¶75.    April argues this factor "should have favored [her]," since she "owns her own home"

and "regularly attends church and there have been no issues in her home since she and Pablo

married."  While the record confirms that April owns her home,[9] April ignores the fact that

she voluntarily shares that home with Pablo, who she knows is working without authorization

from the federal government, has violent tendencies, and uses a questionable discipline

method for Andrew.  Moreover, despite April's assertion, the record shows that she and

Pablo have had domestic-violence issues in their home since their marriage.  Regarding

April's church attendance, the chancellor previously noted and weighed that fact in April's

---

[9] The record indicates that April's father gave her the home in which she currently resides.

favor.

¶76. The dissent "fail[s] to see how a person's status as to citizenship is relevant to a determination of unfitness as a parent." Diss. Op. ¶ 124. But this case is not about Pablo's fitness as a parent.

¶77. The dissent "disagree[s] . . . that Pablo's citizenship status is a relevant factor in determining April's parental fitness." Diss. Op. ¶ 124. But it is not Pablo's citizenship status that is at issue. Instead, the issue is April's continued relationship with an individual who she knows is committing an illegal act. April acknowledges that Pablo has lived and worked in this country illegally since 2013. April admits that because Pablo does not have to pay income tax, neither she nor Pablo are in a hurry for him to become a legal citizen.[10] April's continued relationship with Pablo is a relevant factor in her parental fitness. Indeed, it speaks to her overall poor judgment. Thus, the chancellor's consideration of April's relationship with Pablo was not an abuse of discretion.

### (11) Other Factors Relevant to the Parent-Child Relationship

¶78. In his analysis of this factor, the chancellor considered the GAL's final report, in which the GAL recommended that David be awarded primary custody of Andrew. The chancellor noted that the GAL "fully investigated the issue of custody as well as the allegations of sexual abuse raised against [David]." The chancellor reviewed the GAL's report and found "no reason to disagree with his recommendations."

---

[10] We emphasize that the illegal act itself, i.e., illegal immigration, is not the issue. The fact that April continues to reside with an individual who she knows is committing an illegal act is problematic, regardless of the nature of that illegal act.

¶79. The GAL testified that after speaking with Pablo and April, he determined that Pablo had "zero credibility" and that April had "a very serious credibility issue." The GAL explained that April "[d]enied everything" and stated that she "didn't even know why anybody was in court." April further denied any violence between her and Pablo, despite various police reports. Moreover, April denied any drug or alcohol problem, but admitted to "social drinking." She further admitted to asking David to get her some Xanax. The GAL also testified that he believed April was coaching Andrew and explained to the chancellor the basis for his concerns.

¶80. The GAL noted April's "extensive criminal history for prostitution, domestic violence, both as the aggressor and as the victim, [and] possession of controlled substances." Although this criminal history predated Andrew's birth, the GAL found the prior history "concerning," considering the current allegations.

¶81. April asserts the chancellor erred in failing to consider Andrew's half-sister in the *Albright* analysis. Specifically, April asserts, "[t]here is a preference for keeping half-siblings together." April relies on *Sumrall v. Sumrall*, 970 So. 2d 254 (Miss. Ct. App. 2007). In *Sumrall*, the court noted that "in all cases the court shall try 'to keep the children together in a family unit' . . . ." *Id.* at 259 (quoting *Sparkman v. Sparkman*, 441 So. 2d 1361, 1362 (Miss. 1983)). However, the court acknowledged that we "ha[ve] not articulated a general rule that the best interest of siblings is served by keeping them together . . . ." *Id.* (citing *Bredemeier*, 689 So. 2d at 775). Thus, any error in the chancellor's failure to consider Andrew's half-sister is harmless.

26

¶82. April further asserts the GAL never interviewed Andrew regarding the sexual-abuse allegations. She claims this failure amounts to reversible error. In *Jones v. Jones*, 43 So. 3d 465, 481 (Miss. Ct. App. 2009), the Mississippi Court of Appeals found that "the record fail[ed] to reflect that the [GAL] possessed the qualifications to investigate child abuse, to determine substantiation, to interview children regarding allegations of sexual abuse, or to make any expert conclusions as to whether the allegations were substantiated or nor." "Due to the lack of assistance or investigation by a qualified professional in the area of child sexual abuse," the court remanded the case "so that the chancellor [could] obtain necessary assistance in such matters . . . ." *Id.*

¶83. Here, as in *Jones*, the GAL was not qualified to interview Andrew regarding the sexual-abuse allegations. As a result, the GAL allowed the proper agencies to investigate those allegations and to interview the child.

¶84. "The chancellor sits as finder of fact in a child custody dispute." *Johnson v. Johnson*, 872 So. 2d 92, 95 (Miss. Ct. App. 2004) (citing *Rainey v. Rainey*, 205 So. 2d 514, 515 (Miss. 1967)). As such, the chancellor is "vested with the responsibility to hear the evidence, assess the credibility of the witnesses, and determine ultimately what weight and worth to afford any particular aspect of the proof." *Id.* (citing *Rainey*, 205 So. 2d at 515). The record reflects that the chancellor conducted an appropriate *Albright* analysis and considered all relevant factors applicable to the facts of this case. The chancellor's findings are supported by substantial evidence in the record and are not manifestly wrong or clearly erroneous. Accordingly, the chancellor's award of custody to David was proper and is

27

therefore affirmed.

> II. *Whether the chancellor erred by awarding grandparent visitation to Ron*.

¶85. The chancellor determined that Andrew's best interests would be served by allowing visitation with his maternal grandparents, Judi and Ron. April argues the chancellor erred by awarding grandparent visitation to Ron. She does not contest or appeal the chancellor's award of grandparent visitation to Judi.

¶86. April asserts that Ron does not meet the statutory criteria for grandparent visitation because he is a step-grandparent. Whether a step-grandparent has a right to petition to seek visitation with the child depends entirely on whether he or she is a "grandparent" within the meaning of Mississippi Code Section 93-16-3 (Rev. 2018). This presents an issue of statutory interpretation, which is reviewed de novo. *T.T.W. v. C.C.*, 839 So. 2d 501, 503 (Miss. 2003).

¶87. Grandparents do not possess a common-law right of visitation. *Smith v. Wilson*, 90 So. 3d 51, 58-59 (Miss. 2012). Such a right is purely statutory. Section 93-16-3 provides,

> (1) Whenever a court of this state enters a decree or order awarding custody of a minor child to one (1) of the parents of the child or terminating the parental rights of one (1) of the parents of a minor child, or whenever one (1) of the parents of a minor child dies, either parent of the child's parents may petition the court in which the decree or order was rendered or, in the case of the death of a parent, petition the chancery court in the county in which the child resides, and seek visitation rights with the child.

> (2) Any grandparent who is not authorized to petition for visitation rights pursuant to subsection (1) of this section may petition the chancery court and seek visitation rights with his or her grandchild, and the court may grant visitation rights to the grandparent, provided the court finds:

28

(a) That the grandparent of the child had established a viable relationship with the child and the parent or custodian of the child unreasonably denied the grandparent visitation rights with the child; and

(b) That visitation rights of the grandparent with the child would be in the best interests of the child.

Miss. Code Ann. § 93-16-3 (Rev. 2018).

¶88. Section 93-16-3 does not expressly define "grandparent," but it does refer to a grandparent as the "parent of a child's parent." Miss. Code Ann. § 93-16-3(1). Notably, no reference is made to a step-grandparent in the statute.

¶89. In *Lott v. Alexander*, 134 So. 3d 369, 374 (Miss. Ct. App. 2014), the court reversed the chancellor's award of visitation to great-grandparents. The court noted that "[n]either subsection one or two of 93-16-3 purports to authorize visitation awards to great-grandparents." *Id.* at 372. The court found that "[g]iving the term 'grandparent' its plain and ordinary meaning, the intent of the Legislature is clear and unambiguous." *Id.* at 373. As a result, the court found it "lack[ed] authority to add words or meaning to a statute that is plain on its face." *Id.* at 374. Additionally, in *Pruitt v. Payne*, 14 So. 3d 806, 811 (Miss. Ct. App. 2009), the court found a stepfather "ha[d] no right to visitation with his stepchildren under the laws of the State of Mississippi."

¶90. Here, as in *Lott*, "[n]either subsection one or two of [Section] 93-16-3 purports to authorize visitation awards to [step]-grandparents." *Id.* at 372. This Court does not have the "authority to write into the statute something which the Legislature did not itself write therein, nor can [this Court] ingraft upon it any exception not done by the lawmaking department of the government." *Id.* at 373 (quoting *Wallace v. Town of Raleigh*, 815 So.

29

2d 1203, 1208 (Miss. 2002)). "While the Legislature has chosen to extend visitation rights to grandparents by statute, they have declined to extend that same right to step[-grandparents]." *Pruitt*, 14 So. 3d at 811.

¶91. Because Ron, as Andrew's step-grandparent, does not meet the criteria of a "grandparent" under Section 93-16-3, the chancellor erred by granting Ron grandparent visitation rights with Andrew.[11] Accordingly, we reverse and render on this issue.

> III. *Whether the chancellor erred by holding April in contempt.*

¶92. As previously noted, the agreed order entered by the parties on December 20, 2013, provided, in part, as follows:

> 5. The child experienced significant separation anxiety and because of that shall continue monthly visits with Dr. Zinkus until he is released by Dr. Zinkus or referred to another treating doctor.

Notwithstanding the agreed order, in May 2015, April sought a referral from Andrew's pediatrician and then withdrew Andrew from Dr. Zinkus's care and placed him with Dr. Lancaster. As a result, the chancellor found April to be in contempt.

¶93. The "[f]ailure to comply with a court order is prima facie evidence of contempt." *Evans v. Evans*, 75 So. 3d 1083, 1087 (Miss. Ct. App. 2011) (citing *McIntosh v. Dep't of Human Servs.*, 886 So. 2d 721, 724 (Miss. 2004)). "To rebut a prima facie case of contempt, a defendant must show an 'inability to pay, that the default was not willful, that the provision [violated] was ambiguous, or that performance was impossible.'" *Id.* (citing Deborah H.

---

[11] Although Ron has no *legal* right to grandparent visitation under Section 93-16-3, nothing in Section 93-16-3 prevents Ron from visiting or having a relationship with Andrew. "[T]the more familial bonds a child has is generally better for the child . . . ." *Lott*, 134 So. 3d at 374 (quoting *Cole v. Thomas*, 735 S.W.2d 333, 335 (Ky. Ct. App. 1987)).

Bell, *Bell on Mississippi Family Law* § 11.05[1][a] (1st ed. 2005)). An adjudication of civil contempt must be proved by clear and convincing evidence. *Id.*

¶94. April asserts that she "did not willfully violate any court orders, as she received a referral from the child's physician in regards to Dr. Lancaster." Yet, it is undisputed that Dr. Zinkus did not release Andrew or refer him to another physician. Instead, April, on her own, without notice to David, Dr. Zinkus, or the chancellor, and without authority by the chancellor, sought the referral to Dr. Lancaster, despite more than two years of treatment by Dr. Zinkus. In other words, the child ceased counseling with Dr. Zinkus not because Dr. Zinkus referred the child to another treating physician, but because April thought it was best for him to see someone else.

¶95. April further asserts, "[e]ven if her understanding [of the agreed order] was inappropriate, it was not contempt as she was . . . acting upon the advice of her [former] legal counsel in doing this." However, the only support for this assertion is April's own self-serving testimony at trial. Indeed, the record shows that April advised Dr. Zinkus that she could no longer communicate with David. It was April's personal issues with David, not her attorney's advice, that had prompted the referral to Dr. Lancaster.

¶96. "The purpose of civil contempt is to enforce or coerce obedience to the orders of the court." *Lahmann v. Hallmon*, 722 So. 2d 614, 620 (Miss. 1998) (citing *Jones v. Hargrove*, 516 So. 2d 1354, 1357 (Miss. 1987)). Contempt matters are left to the substantial discretion of the chancellor. *Id.* This Court will not reverse a contempt citation when the chancellor's findings are supported by substantial credible evidence. *Varner v. Varner*, 666 So. 2d 493,

31

496 (Miss. 1995). The record reflects substantial credible evidence to support the chancellor's findings that April was in contempt of paragraph five of the agreed order. Thus, we affirm.

*IV.     Whether the chancellor erred in assessing fees and costs against April.*

¶97.    The chancellor awarded $1,800 in attorneys' fees to David as a result of April's contempt of court and also awarded $6,942.50 in attorneys' fees to David for his defense against April's unsubstantiated allegations of sexual abuse. The chancellor further assessed all GAL fees against April, the total of which amounted to $26,185.64. We separately address each award.

*A.     Attorneys' Fees for Contempt*

¶98.    "When a party is held in contempt for violating a valid judgment of the court, attorney's fees should be awarded to the party that has been forced to seek the court's enforcement of its own judgment." *Gregory v. Gregory*, 881 So. 2d 840, 846 (Miss. Ct. App. 2003) (citing *Varner*, 666 So. 2d at 498). Because the chancellor's finding of contempt was proper, the chancellor did not abuse his discretion in awarding attorneys' fees to David. Thus, the chancellor's award of $1,800 in attorneys' fees is affirmed.

*B.     Attorneys' Fees for Unsubstantiated Abuse Claims*

¶99.    Under Mississippi Code Section 93-5-23 (Rev. 2018), "[i]f after investigation by the Department of Human Services . . . allegations of child abuse are found to be without foundation, the chancery court shall order the alleging party to pay all court costs and reasonable attorney's fees incurred by the defending party in responding to such allegation."

32

The chancellor found April's initiation of the unsubstantiated allegations was "the type of conduct that [Section 93-5-23] anticipates when it makes an award of attorney fees . . . available to one who has been unjustly accused without substantial foundation." As a result, the chancellor awarded David attorneys' fees for his defense of the unsubstantiated allegations of abuse.

¶100. April argues "the extreme nature of the conduct required for this statute to be invoked has not been shown as April's concerns were well-founded." In support of her argument, April relies on *Jones* and *Gregory*. April's reliance on *Jones* and *Gregory* is misplaced, because both cases are distinguishable.

¶101. In *Jones*, the chancellor found that the child abuse allegations were "well-founded" because the father admitted to the underlying behavior investigated by the GAL. *Jones*, 43 So. 3d at 482. As a result, the chancellor found that an award of attorneys' fees under Section 93-5-23 was not warranted. *Id.* Here, unlike in *Jones*, David did not admit to inappropriately touching Andrew. Although David acknowledged that he has washed Andrew's hair in the bathtub, he explained that it was to prevent water from getting into Andrew's ear after an ear infection. Importantly, following two separate investigations, CPS found no inappropriate actions by David.

¶102. In *Gregory*, the parents were going through a divorce. *Gregory*, 881 So. 2d at 842. The mother claimed that the father inappropriately touched their child and reported the alleged sexual abuse. *Id.* at 843. The father was arrested and charged with sexual abuse. *Id.* At trial, the mother presented testimony from multiple experts who opined that the child

33

had been sexually abused. *Id.* In contrast, the father presented an expert who opined that no abuse had occurred. *Id.* The chancellor ultimately determined that the child was not sexually abused by his father. *Id.* at 844.

¶103. On appeal, the court found "no basis on which [the chancellor's] determination should be disturbed." *Id.* at 844. Yet, while the court upheld the chancellor's fact-findings regarding abuse, it did not find evidence in the record to support that "even if the [abuse] claim was untrue, that it was fabricated by [the mother] intended in a cruel and inhuman way to injure her husband." *Id.* at 844. The court explained that "[i]f there was evidence, even if only circumstantial, that [the mother] created the story and coached her son regarding what to say, a basis for a divorce might be shown." *Id.* at 844-45.

¶104. Here, unlike in *Gregory*, no evidence of abuse was presented at trial. However, evidence was presented that April coached Andrew regarding the sexual-abuse allegations. Yet all allegations of sexual abuse were found to be unsubstantiated. Accordingly, the record supports the chancellor's award of attorneys' fees under Section 93-5-23. Thus, the award of $6,942.50 in attorneys' fees is affirmed.

### C. GAL Costs

¶105. The chancellor assessed the GAL costs as follows:

> All costs of the [GAL] are . . . assessed to [April]. To the extent that these fees have been paid by [David], he shall be entitled to a monetary judgment for that amount of those fees. That any unpaid fees shall be paid by [April], as well.
>
> That a copy of the [GAL] fees . . . was introduced at trial . . . and showed that [David] paid a total of $22,127.30. That at the time of the trial, there was an outstanding balance of $3,158.34 and the [GAL] has incurred an additional $900.00 since that date which still remains unpaid. Therefore, the [c]ourt

34

awards a monetary judgment in the amount of $22,127.30 against April . . . in favor of David . . . for his payment of the [GAL] fees prior to trial and the [c]ourt awards a monetary judgment in the amount of $4,058.34 against April in favor of the [GAL].

April argues the chancellor's assessment of "all" GAL fees was improper. We agree.

¶106. "In all cases in which a [GAL] is required, the court must ascertain a reasonable fee or compensation to be allowed and paid to such [GAL] for his service rendered in such cause, to be taxed as a part of the cost in such action." Miss. R. Civ. P. 17(d). Under Section 93-5-23, GAL fees are treated as court costs to be awarded against the nonprevailing party. *Miss. Dep't of Human Servs. v. Murr*, 797 So. 2d 818, 821 (Miss. 2000) (citing Miss. Code Ann. § 93-5-23). "'Chancery courts have large discretion in apportioning costs.'" *McCraw v. Buchanan*, 10 So. 3d 979, 985 (Miss. Ct. App. 2009) (quoting *Ashburn v. Ashburn*, 970 So. 2d 204, 217 (Miss. Ct. App. 2007)). "'Nevertheless, the exercise of such discretion is not final . . . , and if it appears that the decree apportioning the costs works a manifest injustice on any of the parties, the decree will be reversed.'" *Id.* (quoting *Ashburn*, 970 So. 2d at 217).

¶107. The chancellor found that "[b]ased on the allegations made by the parties . . . , the appointment of a [GAL] [wa]s required." The chancellor appointed the GAL "to investigate and ascertain the facts, and make reports and recommendations to th[e] [c]ourt as to what is in the best interest of the minor child." The chancellor noted that "the [p]arties may be equally responsible for payment of the attorney's fees incurred by the [GAL] in investigating this case." The chancellor ordered David to pay $1500 to the GAL as a retainer for his services, "plus any travel costs or other expenses that may be incurred by the [GAL],

including the costs of obtaining records from third parties, in regard to this investigation."

¶108. Notably, the GAL was appointed on September 29, 2016, approximately one year *before* the sexual-abuse allegations were made. Thus, although the GAL's appointment included an investigation of the sexual-abuse allegations, his appointment was not limited to those allegations.

¶109. In ***Tidmore v. Tidmore***, 114 So. 3d 753, 758 (Miss. Ct. App. 2013), the chancellor found the abuse allegations made by the mother were without foundation and therefore assessed attorneys' fees against her. On appeal, the Mississippi Court of Appeals found that while the father was entitled to an award of attorneys' fees, it was unclear whether the total amount of fees awarded was for the defense against the abuse allegations. *Id.* at 759. The court explained that it appeared that at least some of the fees awarded were for the modification-of-child-custody proceedings. *Id.* As a result, the court reversed and remanded in order for the chancellor to determine the amount of attorneys' fees that should be awarded to the father for the defense against the baseless abuse allegations. *Id.*

¶110. Here, the chancellor assessed all GAL costs against April without any determination as to what portion of those costs were spent investigating the unsubstantiated sexual-abuse allegations. Like the father in ***Tidmore***, David is entitled to those GAL costs incurred as a result of the unsubstantiated abuse allegations. *Id.* However, the record is unclear what portion of the total amount of costs awarded was actually incurred by the GAL in investigating those allegations. *See* Miss. Code Ann. § 93-5-23 ("If after investigation . . . allegations of child abuse are found to be without foundation, the chancery court shall order

the alleging party to pay *all court costs* and reasonable attorney's fees *incurred* by the defending party *in responding to such allegation*." (emphasis added)). Accordingly, the chancellor's assessment of GAL costs is reversed and remanded in order for the chancellor to determine the amount of GAL costs incurred as a result of the unsubstantiated sexual-abuse allegations.

V.      *Whether the chancellor erred by failing to award attorneys' fees to April.*

¶111. April asserts she incurred attorneys' fees and expenses in the amount of $30,396.88. She claims she does not have the funds or assets to pay her attorneys' fees. As a result, April argues the chancellor's "decision to not award [her] attorney's fees was error which must be reversed and remanded."

¶112. "[A]ttorney's fees are not normally awarded in child custody modification actions." *Mixon v. Sharp*, 853 So. 2d 834, 841 (Miss. Ct. App. 2003). Regardless, "if 'a party is financially able to pay her attorney, an award of attorney's fees is not appropriate.'" *Wells v. Wells*, 35 So. 3d 1250, 1259 (Miss. Ct. App. 2010) (quoting *Young v. Young*, 796 So. 2d 264, 268-69 (Miss. Ct. App. 2001)).

¶113. Here, the chancellor found that "the incurring of attorney fees w[ould] not impose a financial hardship on [April]." The chancellor noted that April's financial statement was "unreliable due to obvious errors," that "[April's] husband's income ha[d] not been disclosed from which she reaps the benefit," and that April "owns her home debt free, and chooses to refrain from working at her own election."

¶114. We cannot say that the chancellor's determination was manifestly wrong or an abuse

37

of discretion. Accordingly, the chancellor's denial of April's request for attorneys' fees is affirmed.

## CONCLUSION

¶115. The record shows that a substantial change in circumstances has occurred since the December 20, 2013 order was entered that adversely affects the child and renders April unfit to have custody of the minor child. The chancellor's *Albright* analysis and award of custody to David is supported by substantial evidence in the record and is therefore affirmed. However, because Ron does not meet the statutory criteria of a "grandparent," the chancellor's award of grandparent visitation to Ron is reversed and rendered. Additionally, the chancellor's finding that April was in contempt of the agreed order is supported by the record and is therefore affirmed. Lastly, the chancellor's determination and assessment of fees and costs are proper and are therefore affirmed with the exception of the GAL costs, which are reversed and remanded for further consideration consistent with this opinion.

¶116. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART; AND REVERSED AND REMANDED IN PART.**

**COLEMAN, MAXWELL, BEAM AND CHAMBERLIN, JJ., CONCUR. RANDOLPH, C.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY ISHEE, J. KING, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY ISHEE, J. KITCHENS, P.J., NOT PARTICIPATING.**

**RANDOLPH, CHIEF JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶117. Ultimately, after a careful review and analysis of an unusual set of circumstances, the learned chancellor unquestionably considered the best interest of the child, and his findings

were neither manifestly wrong nor clearly erroneous. ***Heiter v. Heiter***, 192 So. 3d 992, 994 (Miss. 2016). Nor did the chancellor apply an erroneous legal standard, which would allow this Court to reverse. ***Id.*** I would affirm the chancellor's order in full.

¶118.   The best interest of the child is always the polestar consideration in all matters related to children, including awarding grandparent visitation. ***Smith v. Martin***, 222 So. 3d 255, 263 (Miss. 2017). In reviewing a chancellor's factual determinations,

> we, as an appellate court, will affirm the decree if the record shows any ground upon which the decision [may] be justified. . . . We will not arbitrarily substitute our judgment for that of the chancellor who is in the best position to evaluate all factors relating to the best interest of the child.

***Tucker v. Tucker***, 453 So. 2d 1294, 1296 (Miss. 1984) (internal quotation marks omitted) (quoting ***Yates v. Yates***, 284 So. 2d 46, 47 (Miss. 1973)). More than sufficient evidence supported the chancellor's finding that an award of visitation to Ron Fox was in Andrew's best interest and was proper under the laws of our state.

**ISHEE, J., JOINS THIS OPINION.**

**KING, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶119.   I agree that the chancellor properly modified custody of April Garner's minor child to his uncle and properly found April in contempt. However, I respectfully disagree with the majority's finding that the chancellor lacked authority to award grandparent visitation to a step-grandparent.

¶120.   Mississippi Code Section 93-16-3(2) provides that

> Any grandparent who is not authorized to petition for visitation rights pursuant to subsection (1) of this section may petition the chancery court and seek

39

visitation rights with his or her grandchild, and the court may grant visitation rights to the grandparent, provided the court finds:

(a) That the grandparent of the child had established a viable relationship with the child and the parent or custodian of the child unreasonably denied the grandparent visitation rights with the child; and

(b) That visitation rights of the grandparent with the child would be in the best interests of the child.

Miss. Code Ann. § 93-16-3(2) (Rev. 2018). Although Section 93-16-3(1) refers to a grandparent as a parent of the child's parents, the Legislature did not define the word "grandparent" in the statute or provide that "grandparent" was limited to biological grandparents only. Thus, I would find that the term "grandparent" should not be so narrowly construed as to apply only to natural grandparents.

¶121. "The best interests of the child must be the polestar consideration in awarding grandparent visitation." *T.T.W. v. C.C.*, 839 So. 2d 501, 504 (Miss. 2003). This Court recognizes the doctrine of in loco parentis, in which a nonbiologically related person may step in and assume the status of a parent without a formal adoption. *Logan v. Logan*, 730 So. 2d 1124, 1126 (Miss. 1998); Miss. Code Ann. § 93-16-3(1) (Rev. 2018). In *Logan*, this Court reiterated that "[i]t is well settled that a chancellor may grant custody of a stepchild to a stepparent when the chancellor finds the natural parents to be unfit." *Id.* at 1127 (citing *Sellers v. Sellers*, 638 So. 2d 481, 485 (Miss. 1994)). The Court went on to hold that,

> Where a stepfather, as an incident to a new marriage, has agreed to support the children of a previous marriage, or where he does so over a period of time and the mother and the children in good faith rely to their detriment on that support, the best interests of the children require entry of a child support decree against the stepfather. Thus, it follows that if a stepparent can be required to pay child support for a stepchild based on his support of the

40

stepchild over a period of time, where it is in the best interests of the child, he should be allowed to have custody of the stepchild based on the affection for and support of that child over a period of time. With the burden should go the benefit.

Even without clear statutory authorization for the inclusion of stepchildren as "children of the marriage" under § 93–5–23, it is clear from the decisions of this Court that a stepparent should be considered among the third parties entitled to custody of a child by overcoming the presumption of the fitness of the natural parents. This comports with our well-established concern for the best interests of the child in custody matters.

*Id.* at 1126 (citations omitted). This Court also has determined that a nonbiological father may be considered a "'father in fact' and is thus entitled to rights of custody, visitation, and the like. . . ." *J.P.M. v. T.D.M.*, 932 So. 2d 760, 770 (Miss. 2006). If a stepparent may be granted custody of a child or if a nonbiological father may be considered a father-in-fact who is entitled to custody or visitation, a step-grandparent may also be entitled to visitation rights.

¶122. Sufficient evidence exists in the record showing that Ronald Clyde Fox's (Ron's) relationship with Andrew was as Andrew's grandparent. Ron testified that he had been married to Judi Garner for almost nineteen years. Thus, Ron has been in married to Andrew's natural grandmother for the entirety of Andrew's life. Ron also considered April to be his daughter. He testified that he was Andrew's grandfather and that he was April's dad. Dr. Michael Christian Wallace, a family physician and significant other of David Smith, also testified that Ron was Andrew's "Poppy," that Andrew loved to see Ron, and that Andrew and Ron would "play and talk just like any other grandfather would with his grandson."

¶123. Further, the chancellor continuously referred to Ron and Judi as "the maternal grandparents" of Andrew and found that Ron had been involved with Andrew throughout

41

Andrew's life when he was permitted to do so by April. I would not disrupt the chancellor's determination that, in Andrew's best interest, Ron should be given visitation rights. Therefore, I dissent from the majority's interpreting Section 93-16-3 so narrowly as to exclude Ron from visitation rights with Andrew. Ron has been Andrew's grandparent for the entirety of Andrew's life. Undoubtedly the Legislature would not deny such a person a right at least to petition for visitation.[12]

¶124. I also write separately to express my concern regarding certain portions of the majority's opinion. The majority lists the chancellor's findings of unfitness, including "'[c]avorting with a known illegal immigrant with full knowledge of his status. . . .'" Maj. Op. ¶ 22. Later, in its analysis of the stability of the home environment, the majority again uses Pablo Garcia's citizenship status as a factor against April, stating, "April ignores the fact that she voluntarily shares that home with Pablo, who she knows is working without authorization from the federal government. . . . ." Maj. Op. ¶ 75. I agree with the majority's statement that "this case is not about Pablo's fitness as a parent." Maj. Op. ¶ 76. However, the majority continues to use Pablo's citizenship status as a negative factor against April's fitness as a parent. I fail to see how a person's citizenship status is relevant to a determination of unfitness as a parent.[13] Thus, I disagree with the majority's contention that Pablo's

---

[12]*See **In re Custody of D.M.M.***, 404 N.W.2d 530 (Wis. 1987).

[13]The majority argues that the issue does not concern Pablo's citizenship but does concern "April's continued relationship with an individual who she knows committing an illegal act." Maj. Op. ¶ 77. However, the majority continues to discuss the status of Pablo's citizenship. According to the majority's logic, April could be found to have poor parental fitness if she was engaged in a relationship with a person who had unpaid parking tickets or who illegally downloads movies and television shows. Thus, I continue to disagree with

citizenship status is a relevant factor in determining April's parental fitness. However, I agree with the majority's determination that April's continued relationship with a person who exhibits violent tendencies is relevant and is detrimental to Andrew's best interests.

¶125. In addition, the chancellor found that David's "homosexual lifestyle" called his moral fitness into question. The chancellor relied on a case decided more than twenty years ago, stating that "[t]he Mississippi Supreme Court has clearly held that the chancellor can consider a homosexual lifestyle as a factor relevant in this custody determination of the child. . . ." (citing *Weigand v. Houghton*, 730 So. 2d 581 (Miss. 1999)). Yet the chancellor in *Weigand* had stated, "[t]he fact that the Plaintiff and his 'life partner' engage in sexual activity which include both oral or anal intercourse is repugnant to this Court as constituting a felony act under the laws of this state." *Id.* at 589 (McRae, J., dissenting). The *Weigand* chancellor quoted Mississippi Code Section 97-29-59: "[e]very person who shall be convicted of the detestable and abominable crime against nature committed with mankind or with a beast, shall be punished by imprisonment in the penitentiary for a term of not more than ten years." *Weigand*, 730 So. 3d at 590 (McRae, J., dissenting).

¶126. The court's view of homosexuality is antiquated and clearly wrong. In *Obergefell v. Hodges*, 135 S. Ct. 2584, 2593, 192 L. Ed. 2d 609 (2015), the United States Supreme Court stated that "[t]he Constitution promises liberty to all within its reach, a liberty that includes certain specific rights that allow persons, within a lawful realm, to define and express their identity." The Supreme Court then held that same-sex couples have the right to marry. *Id.* at

_____

the majority's finding that Pablo's citizenship status negatively affects on April's parental fitness.

43

2599. Therefore, the question of homosexual relationships, either married or unmarried, should have no greater detrimental weight than that of heterosexual relationships, married or unmarried. Instead, the majority finds that "David's sexuality is not, and has never been, a secret." I would find that the chancellor erred by concluding that David's sexuality negatively impacted his moral fitness and would find that *Weigand* should be overruled. As Justice McRae stated in his dissent, "[t]he morality of homosexuality, however, should not be at issue before this Court or the lower court." *Weigand*, 730 So. 2d at 588 (McRae, J., dissenting). Accordingly, I would hold that, due to April's drug and alcohol problems, this factor favors David.

¶127. In summary, I dissent from the majority's holding that Ron did not meet the criteria of a grandparent and would affirm the chancellor's grant of visitation rights to Ron. In addition, I would find that David's sexuality had no bearing on his moral fitness as a parent. I also disagree with the majority's repeated assertions that Pablo's citizenship status should be a used as a factor against April.

      **ISHEE, J., JOINS THIS OPINION.**